**LONE MOUNTAIN PRODUCTION COMPANY, Plaintiff–Appellee,**

v.

**NATURAL GAS PIPELINE COMPANY OF AMERICA, Defendant–Appellant.**

No. 91–4018.

United States Court of Appeals, Tenth Circuit.

Dec. 7, 1992.

Stewart M. Hanson, Jr. of Suitter Axland Armstrong & Hanson, Salt Lake City, UT (Charles P. Sampson, Paul Simmons, Suitter Axland Armstrong & Hanson, Salt Lake City, UT, and Peter Y. Connor, Mid-Con Corp., Lombard, IL, of counsel; Paul E. Goldstein, MidCon Corp., Lombard, IL, and Peter J. Levin, Pierson Semmes and Bemis, Washington, DC, with him on the brief), for defendant-appellant.

John W. Anderson, Pruitt, Gushee and Bachtell, Salt Lake City, UT (Edward W. Clyde, Clyde, Pratt & Snow, with him on the brief), for plaintiff-appellee.

Before McKAY, Chief Circuit Judge, TACHA, Circuit Judge, and BROWN, Senior District Judge.*

---

* Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

WESLEY E. BROWN, Senior District Judge.

The Plaintiff–Appellee, Lone Mountain Production Company, (hereafter, "Lone Mountain") brought this action to enforce the terms of a ten-year "take or pay" gas purchase contract, under which its predecessor in interest, the GEO Oil and Gas Company of Houston, agreed to sell natural gas to the Defendant–Appellant, Natural Gas Pipeline of America (hereafter "Natural Gas").

The trial was bifurcated to hear separately the issues of liability and damages. Following a non-jury trial, the district court found that Natural Gas was liable to take or pay for gas under the contract from February 17, 1987, 710 F.Supp. 305. At the conclusion of the trial before the court on damages, the district court entered judgment in favor of Lone Mountain for damages of $977,561.64, plus prejudgment interest of $173,780.35, for a total award of $1,151,341.99.

In this appeal, Natural Gas claims that the trial court erred in finding that Lone Mountain had an enforceable interest in the gas purchase contracts, that the determination of the amount and price of available gas was erroneous, and that prejudgment interest was improperly awarded.

The factual background leading to the trial court's conclusion that Lone Mountain had an enforceable interest in the contracts at issue is essentially without dispute.

In 1971, the State of Utah issued a Mineral Lease on a 600–acre tract located in Section 32, Township 16S, Range 26E, to the Anschutz Corporation and by April, 1980, the lease had been divided into two parcels of 280 and 320 acres each, segregated vertically at a level of 4,338 feet deep.

Under date of April 18, 1980, defendant Natural signed three contracts to purchase all of the gas in the upper strata of the 280–acre parcel. Under the contracts, Natural was entitled to take the gas at the contract price in the contract quantities, or to pay for the gas and take it at a later date.

The first contract was with GEO Oil & Gas Company of Houston (GEO) which owned 100% of the operating rights—that is—the working interest, less the royalty interest, subject to a 6¼% overriding royalty, and a reversionary interest.

The second contract was with the Texoma Production Company (Texoma) which owned 50% of the overriding royalty, and a reversionary interest.

The third contract was with the Nicor Exploration Company (Nicor) which owned the remaining 50% of the overriding royalty and the reversionary interest.

The reversionary interest gave Texoma and Nicor the right to convert their overriding royalty into a 50% working interest upon payout. Quinoco Oil & Gas Programs (Quinoco) obtained GEO's interest, MidCon Central Exploration Company (MidCon) succeeded to Texoma's interest, and the options to convert the overriding royalty into working interests were exercised. In this manner, Quinoco owned 50%, Nicor 25% and MidCon 25% of the operating rights.

In February–April, 1986, Lone Mountain entered into "Farmout Agreements" with Quinoco, MidCon, and Nicor, under which Lone Mountain was entitled to receive all of the operating rights of Quinoco and Nicor, and most of MidCon's operating rights, in exchange for Lone Mountain's completion of a producing well upon the property. (Exhibits 14, 15, 16).

When Lone Mountain drilled a producing well, it received the promised assignments of operating rights from Quinoco, Nicor and the Apache Corporation, successor to MidCon.

The assignment from Quinoco was dated September 18, 1986. The assignment from Nicor was dated January 21, 1987, but made effective as of June 17, 1986, and the assignment from Apache was dated January 21, 1987, to be effective on the first day of production from the well. Lone Mountain, in accepting each assignment, agreed

that it was "subject to all of the covenants and obligations" of the Lessee. (Exhibits 18, 19, 20).

. Before beginning to drill, Lone Mountain notified defendant that it had been designated as Operator, that it intended to drill a well which was committed under the GEO contract, and that operations would begin May 15, 1986. Defendant did not respond to this notification.

The well was completed on June 14, 1986. On June 17, 1986, Lone Mountain sent completion notices and the drilling history to defendant and requested that the well be connected to Natural's gathering system.

On July 22, 1986, defendant acknowledged that the well had been submitted under the contract and requested that its delivery agent, Northwest Pipeline Company, establish a point of delivery.

On September 9, 1986, defendant declined to connect the Lone Mountain well to its gathering system, invoking the *force majeure* clause of the GEO contract, and notifying Lone Mountain "that the connection of this well by Natural is not economically feasible."[1] In this letter, Defendant advised Lone Mountain that:

> ... before Natural can recognize any interest you may have in the above-refer-

enced contract, you will need to furnish copies of your farmout and assignment agreements with Quinoco for Natural's review and enter into a letter agreement recognizing the succession of Lone Mountain to the interest of Quinoco. (Exhibit 24).[2]

On September 30, 1986, Lone Mountain stated its intent to exercise the option of proceeding on its own under Article Seventh of the Gas Purchase Contract, to connect the well to the gathering facilities, and it thereafter made the connection at a mutually acceptable point on October 15, 1986, at a cost of $25,000.[3]

By letter of October 8, 1986, Natural Gas wrote to Lone Mountain concerning a succession agreement:

> ... Natural cannot recognize your interest in the above referenced Purchase Contract until you furnish copies of your farmout agreement and recorded assignment from Quinoco and an appropriate succession letter agreement is executed. Natural cannot make payment to you, nor can Natural authorize Northwest Pipeline to receive and transport this gas for Natural's account until the succession letter agreement is finalized. (Exhibit 26)[4]

---

1. Article Twelfth of GEO Contract provided that if performance was prevented or delayed by force majeure, obligations would be suspended during the continuance of the delay. The term "force majeure" was defined to include "fire, explosion, storms or storm warnings, adverse action of the elements, strikes or other labor difficulties, restriction or restraint imposed by law or by regulation or order of duly constituted governmental authority ... acts of civil or military authority, freezing of wells or lines of pipe, acts of the public enemy, breakdown of, or accident to facilities or equipment, partial or entire failure of wells, inability to obtain necessary materials, equipment or rights-of-way on customary terms, and any other cause that is reasonably beyond control by the party affected thereby."

    On June 2, 1986, Natural Gas notified Quinoco of its serious economic problems, invoking the impracticability and impossibility of performance provisions of the force majeure provisions of the contract. Lone Mountain was not advised of this situation inasmuch as it had not yet obtained rights under the GEO contract. (Exhibit E to Defendant's letter of September 9, 1986, PX 24).

2. All correspondence and negotiations concerning the Geo contract were conducted by Lone Mountain through MidCon Services, which acted as Agent for Natural Gas Pipeline Company.

    In this letter, defendant Natural Gas also offered to release the gas from dedication to the contract.

3. Article Seventh of the Gas Purchase Contracts stated that Natural Gas was obliged to provide gathering facilities for the Seller's wells if the connection of the well was "economically feasible". Paragraph 2 of Article Seventh further provided that:
    > "2. Gas available from wells to which Pipeline is not obligated to connect ... may at Seller's option be delivered by Seller to Pipeline at a mutually acceptable point ... it being understood that in all other respects this Contract shall govern as to the sale and purchase of any such gas."

4. In this letter, Natural again stated that "due to force majeure, ... Natural cannot *increase* its request for gas under the Gas Purchase Contract even if this additional well is connected, and offered to release the gas from the purchase agreement." (Emphasis supplied).

By letter of November 18, 1986, defendant again stated that it would need information "to verify and recognize Lone Mountain's interest in Natural's Purchase Contract with Quinoco dated April 14, 1980," and requested an "appropriate succession letter agreement." (Exhibit 28)

By letter of November 25, 1986, Natural Gas again requested documents to evidence Lone Mountain's acquisition of an interest in the well, further stating its agreement to take gas pursuant to the Contract:

> Once Lone Mountain has provided Natural with the necessary documents evidencing Lone Mountain's interest in the Contract, Natural will take gas from the referenced well in accordance with the provision of Natural's June 2, 1986 letter to Quinoco, a copy of which is attached for your convenience. Due to the force majeure situation on Natural's system, Natural cannot, at this time, accommodate the volumes produced during a deliverability test. Therefore, Natural proposes that an interim maximum deliverability of 1257 Mcf/d be used until such time as conditions on Natural's system permit a deliverability test to be performed. This estimated interim maximum deliverability is based upon the data you have supplied to Natural's engineering department. Based upon this interim maximum deliverability and in accordance with the provisions of Natural's June 2, 1986 letter, Natural proposes to take 118 Mcf per day from this well. (Exhibit 30)

On December 2, 1986, Lone Mountain furnished Natural with copies of the assignments and its agreements with the other parties. On December 9, 1986, defendant advised that it would recognize Lone Mountain's interest in the gas and would commence taking gas from the well, "with the understanding that a succession letter agreement substantially in the form of the attached will be executed...." Natural also advised that once details were finalized, "Natural will increase its request for gas under its Gas Purchase Contract

(#1674 dated 4/18/80) by 118 Mcf/d." (Exhibit 32). On December 10, Lone Mountain advised that it was not willing to resolve the dispute so that Natural's "takes" would be in accordance with the proposals of November 25th, since it was Lone Mountain's position that Natural's duty to take gas had already commenced, and should be made in accordance with the Contract. (Exhibit 35).

On February 17, 1987, Lone Mountain sent defendant the executed succession agreements requested. Under these agreements, Lone Mountain and Natural acknowledged "that the interest (Lone Mountain) has acquired, the acreage covered thereby and the gas produced therefrom are subject to the referenced Contract (the GEO contract dated April 18, 1980)," and that Lone Mountain "hereby adopts and ratifies all of the terms, provisions and amendments of said Contract and hereby assumes all obligations originally assumed by Assignor under that Contract as amended and ratified ..." (Attachment, Exhibit 33).[5]

On March 6, 1987, Lone Mountain filed this action alleging that Natural Gas refused to honor its contractual obligations under the Gas Purchase Contract, contending that the "contract quantity" of gas for which defendant is required to pay is 707.25 mcf and that the duty to "take or pay" commenced September 9, 1986, upon the refusal of Natural to make connections with the Lone Mountain well.

Trial was bifurcated with a non-jury trial being held on the issue of liability in September 1988.

During the course of the litigation, defendant claimed that its failure to perform was justified because of "impossibility of performance, commercial impracticability, frustration of purpose, and because the 'take or pay' provision of the contract (was) contrary to public policy and the intent of the parties...." Order of April 4, 1989, p. 6). At trial, these assertions were dropped, and defendant relied upon the assertion that the succession agreements were not

---

**5.** Three separate succession agreements were sent to Natural Gas relating to the succession of Lone Mountain to the interest of Quinoco, Nicor, and Apache Corporation.

proper assignments of the original contract, and that its duty to "take or pay" did not arise because of a failure of certain conditions precedent to its obligation.

Lone Mountain maintained that it was entitled to enforce the contract because all conditions precedent had been satisfied as of February 12, 1987, that the provision that the contractual covenants would "run" with the lease provided sufficient assignment, that the succession agreements themselves were valid contract assignments, and that defendant had waived, or was estopped, from demanding strict compliance with the original contract.

Natural contends that the succession agreements were only assignments of the *leases* under Article Fifteen, Paragraph 2 of the contracts, and were not assignments of the contracts themselves under Paragraph 3 of Article Fifteen. Natural contends that these assignments gave Lone Mountain ownership of the gas, but gave no rights under the contracts.

The trial court sustained the position of Lone Mountain, finding that defendant's duty to take or pay matured on February 17, 1987, when Lone Mountain returned the executed agreements to defendant, as requested, since the succession agreements acted as valid assignments of the contract to Lone Mountain. In this respect, the trial court properly recognized that no particular form is required to effect a valid assignment, *Commodore v. Armour & Company*, 201 Kan. 412, 441 P.2d 815, 820 (1968), and that the assignment language need not be formal if it shows the intention of the owner to transfer his right to property. *Seasons, Inc. v. Atwell*, 86 N.M. 751, 754, 527 P.2d 792, 795 (1974).

Following our review of the record, we find that the trial court appropriately found that the succession agreements were in effect assignments of the contracts.

"Generally, the law favors the assignability of contractual rights, unless the assignment would add to or materially alter the obligator's duty or risk." *Clark v. Shelton*, 584 P.2d 875, 877 (Utah 1978). Here, the three gas purchase contracts specifically set out assignment rights under

Article Fifteenth and provided that all contract covenants would "run" with the leases upon assignment:

2. *Seller may*, without the prior written consent of Pipeline, *make a complete or partial assignment of Seller's leases* covered by this Contract. *All covenants, stipulations, terms conditions and provisions of this Contract shall extend to and be binding upon the respective successors and assigns of the parties hereto and shall be deemed covenants running with the oil and gas leases* and other properties described herein for the full term of this Contract. Any complete or partial assignment of Seller's leases shall contain a provision expressly obligating Seller's assignee to perform Seller's obligations under this Contract and to suffer and permit the full performance thereof. Seller shall promptly provide a copy of any such assignment to Pipeline. (Emphasis supplied)

3. Upon prior written notice to the other party, *this Contract* may be assigned by either of the parties hereto to any person, firm or corporation who shall acquire the assigning party's interest in the properties necessary to perform this Contract; provided, however, that each of the parties hereto covenant and agree that it will, as an integral part of any such assignment, require the assignee thereunder to expressly adopt and assume the terms and provisions of this Contract and to be bound hereunder as to any interest so acquired.... (Emphasis supplied)

While the exact formalities of effecting the assignments of leases and contracts were not strictly followed, it is clear that the language of the succession agreements effectively ensured that Lone Mountain assumed all of the rights and obligations of the contracts, in that Lone Mountain adopted and ratified "all of the terms, provisions and amendments of" those agreements, and assumed "all obligations originally assumed by" the original gas seller under the three contracts.

In addition to the language of the succession agreements, there was evidence that Natural had previously recognized the assignment of other lease interests as valid contractual assignments of gas purchase contracts. Under general rules, and in particular, under Utah law, parties may modify or waive the terms of a contract, despite contractual provisions to the contrary. *Dillman v. Massey Ferguson, Inc.*, 369 P.2d 296, 298 (Utah 1962). Under these circumstances, it is clear that Natural waived and modified the provisions of the contracts which would require strict formal assignment of contract rights.

We further agree with the trial court's conclusion that both waiver and estoppel also bar Natural from insisting on strict compliance with the assignment of contract provisions. Waiver can be express or implied, and exists when one has an intent not to require strict compliance with a contractual duty, while estoppel bars a party when by acts, or silence, one induces another party to act to his detriment in reliance on that silence or act.

At the time it drilled its well, and at the time Lone Mountain filed this action, Natural knew that three contracts covered the leases, but Lone Mountain did not know that there were three separate, but identical contracts to sell the gas to Natural. The trial court found that it was nearly two years after the well connection was made before Natural began to argue that a formal assignment of the contract was needed in addition to the succession agreements.

Because of this delay, Lone Mountain was not able to obtain an assignment of the gas purchase *contract* from Quinoco until March, 1988, and it did not discover that the other two contracts even existed until August, 1988, shortly before the trial to determine liability began. (Testimony of Thomas Hauptman, Trial Transcript, Vol. II, Appendix, pp, 549–551.) In *Caldwell v. Anschutz Drilling Company*, 13 Utah 2d 177, 369 P.2d 964, 966 (1962), the Supreme Court of Utah made it clear that "business

dealings must be carried on in good faith," holding that a party to a contract "should not be permitted to deliberately mislead the offeree into believing that he doesn't have to comply strictly with its requirements; then when the latter has relied upon such representation and gotten into a position where it is practically impossible to so perform, suddenly reverse position and demand such compliance, for the purpose of getting out of the transaction."

In the letter of December 9, 1986, Natural specifically stated that it would "commence taking gas" from the well, "with the understanding that a succession letter agreement substantially in the form of the attached draft will be executed." The succession agreements were executed and returned to Natural.

Under the circumstances of the negotiations between the parties in this action, there is substantial evidence to support the trial court's finding that Natural waived any right that it may have had to demand strict compliance with the assignment provisions of the contracts.

### Damages

Plaintiff's claim for damages is based upon a failure to prepay for available gas from February 17, 1987, when Lone Mountain returned the succession agreements, to September 1, 1988, when Natural began to take gas from the contract area.[6]

The trial court found that the volume of gas for which Natural was obliged to pay should be based upon estimated deliverability, and that Natural's own estimate, with which Lone Mountain agreed, totalled 413,249 Mcf over the claim period. This figure incorporated a factor accounting for the well's declining production over that claim period.

In this appeal, Natural claims that the trial court erred in basing damages upon a preproduction estimate of gas available rather than using actual production data. The actual production from the well was

6. On August 31, 1988, Natural requested that effective September 1, 1988, Lone Mountain deliver for Natural's account "the maximum quantity of gas which Lone Mountain is capable of delivering under the referenced gas purchase contracts." (Exhibit 38)

216,661 Mcf, much less than the estimate of the 413,249 Mcf quantity calculated by Natural.[7]

The trial court's interpretation of "available gas" under the contracts is a question of law, to be reviewed de novo. The trial court's method of computing damages will not be disturbed on appeal if it has a reasonable basis in the evidence. As noted by this Circuit, "... in reviewing the district court's methodology in calculating damages, all we require is a reasonable basis for computation and reliance on the best evidence available in the circumstances." *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1548 (10th Cir.1987).

Applying this standard to our review of the record, it is clear that the trial court's determination of the appropriate quantity of gas was correct and based upon a reasonable analysis of the contracts in evidence.

Plaintiff's claim is based upon a breach of Article Thirteen, Paragraph 2 of the gas purchase contracts, which provided that when delivery facilities were completed, "delivery of gas shall be initiated under this Contract." If Natural did not accept delivery, then it:

> ... *shall* ... nonetheless, commence paying monthly to Seller *for such quantities of gas well gas Seller has available for delivery* hereunder, *and which Pipeline is obligated to receive,....* Pipeline shall thereafter have the right to receive such gas as "make-up" gas in the manner provided in Paragraph 8 of Article Third hereof. (Emphasis supplied)

Natural claims that its obligation to pay should be based on a percentage found in Article Third of the Contracts of the actual production of the well, determined after the claim period, since it is a much better measure of the quantity of gas which Lone Mountain actually "had available" during the claim period.

Natural also claims that under Article Third of the contracts, it is only "obligated to receive" 37.5% of the volume of gas which Lone Mountain had available for delivery. Based on Natural's figures then, it would be liable for only 37.5% of 216,661 Mcf, the amount of *actual* production, for a total volume calculation of only 81,248, instead of the 413,249 Mcf figure found by the court.

Natural's argument concerning a preference for actual production as a measure of damages is irrelevant, for here, Natural contracted to pay upon estimated production. As the trial court noted, there is no provision in Article Thirteen, or anywhere else in the contracts "that would base pre-flow payments on the results of actual production," and that "because actual deliverability is not known at the time pre-flow payments are to be made, Article Thirteenth necessarily requires that pre-flow payments be based on an estimate." (Order of November 7, 1990, p. 15).

Estimates of pre-flow production are just that—estimates, and the parties, recognizing that, provided that any volume of gas paid for, but not actually received, was to be recouped through the make-up provision found in Article Third, Paragraph 8:

> If, for any accounting period, Pipeline pays for any quantities of gas well gas, not actually received by it, Pipeline shall be entitled to receive such quantities of gas well gas so paid for (make-up gas) during the next succeeding five (5) accounting periods.
>
> ... It is further agreed that if Pipeline is unable to receive such make-up gas during the succeeding accounting periods as herein provided due to the inability of Seller's wells to produce quantities sufficient to enable Pipeline to request and take such quantities of make-up gas in addition to the then applicable Contract

---

7. The trial court concluded under the estimated figure, that Lone Mountain had 413,249 Mcf "available for delivery during the claim period" (from February 17, 1987 to September 1, 1988 when Natural began taking delivery of gas. This was a time period of 18 months and fourteen days.

The actual production, based upon a total of 19 months at full capacity, was 216,661 Mcf. See Trans. (March 20, 1990) at 10–12, Aplt.App. at 645–47 (Stinson).

Quantity ... Pipeline shall have such additional time as is necessary to receive such make-up gas. Such make-up quantity of gas so requested and taken shall be only that quantity taken which exceeds the applicable Contract Quantity during an accounting period.

The trial court noted that while Natural risked not being able to recoup its payments through make-up gas, if the well ceased to produce, this was a risk "that Natural accepted by entering into the contract." [8]

As to the basic "obligation to receive" gas, Natural contends that it was obliged to take only a minimum amount of gas under Article Third, Paragraph 6, which provided that it could limit its taking to only 50% of the "effective Contract Quantity" each day.[9]

The "Contract Quantity" was defined in Article Third, Paragraph 1, in this manner:

*Subject to the other provisions of this Contract,* Seller shall sell and deliver and Pipeline shall purchase and receive or pay for if available and not taken, a quantity of gas well gas averaged over each accounting period (hereinafter referred to as the "Contract Quantity") equal to seventy-five percent (75%) of the maximum quantity of gas well gas that Seller's wells can deliver to Pipeline determined in accordance with the provisions contained in Paragraph 3, 4, and 5 of this Article Third.[10] (Emphasis sup-

plied) (Order of November 7, 1990, pp. 21–22).

It is under these provisions of Article Third that Natural contends it was only obligated to receive 37.5% of the seller's maximum quantity of gas available for delivery—that is 50% of the 75% figure mentioned above.

The trial court correctly distinguished the provisions of Article Third and Article Thirteenth, Paragraph 2, as they pertained to Natural's obligation to take and pay for gas under entirely different circumstances:

Article Third determines Natural's obligation to take and/or pay for gas *during the time the well is in production.* It bases its calculations on a Contract Quantity which is determined during production and through the use of a production capability test. Article Thirteenth, on the other hand, *is a pre-flow payment provision.* Article Thirteenth, Paragraph 2 does not refer to a Contract Quantity. Nor does it specifically cross reference Article Third, except for the make-up provision of Article Third, Paragraph 8. Article Thirteenth, Paragraph 2 refers only to the amount of gas Lone Mountain has "available for delivery" and which Natural is "obligated to receive." Nowhere in Article Third are these terms defined or used. (Order of November 7, 1990, Emphasis supplied).

Under these circumstances, Natural's obligation to pay for gas which Lone Mountain had "available for delivery," was the

---

**8.** The nature of the risk was explained by the trial court in this manner:

Though Natural may use the above "make-up" provision to recoup gas for which it has already pre-paid, Natural risks not being able to recoup its payments through the "make-up" provision should the well cease to produce before Natural has taken all its make-up gas. Indeed, make-up gas must exceed the applicable Contract Quantity, which, *when established after placing the well into production,* is 75% of maximum deliverability. Thus Natural's ability to make-up gas is limited to 25% of the well's maximum deliverability. If Natural is not able to recoup its prepayments through taking make-up gas at a rate of 25% of the well's maximum deliverability then those payments are lost. Moreover, the longer the period of non-take the more make-up gas will be required, and the greater the risk

that Natural will not be able to take enough make-up gas to recapture its prepayments. This is a risk that Natural, as an experienced buyer of natural gas is deemed to have known. (*Ibid,* pp. 17–18). (Emphasis supplied)

**9.** Article Third, Paragraph 6 provided that Natural could vary its receipt of gas, and was entitled to receive "on each day and every day" the maximum gas the well was capable of delivering. It was also provided that "Pipeline shall receive each day not less than fifty percent (50%) of the effective Contract Quantity as provided in this Article Third."

**10.** Paragraphs 3, 4, and 5 of Article Third provided for an initial flow test to determine the quantity of gas that could be produced.

estimated quantity of 413,249 Mcf, and was not limited by any language found in Article Third.

The pricing provisions of the three contracts were essentially the same, and as originally set out in Article Fourth, provided:

1. Subject to the other provisions hereof, Pipeline shall pay for each million Btu's of natural gas delivered from each of Seller's wells hereunder, or by which Pipeline is obligated to pay for hereunder, two dollars and forty and four-tenths cents ($2.404) as of March 1, 1980, as provided by the Natural Gas Policy Act of 1978 (N.G.P.A.) along with any applicable escalations or price adjustments provided for by the N.G.P.A.

There were no price changes before or during the claim period in connection with the GEO contract, there is no dispute over the prices payable in that contract, and the parties have stipulated to the prices payable under that contract.[11]

■ With respect to the Texoma gas contract, Natural claims that it was amended June 30, 1986, to provide for "market-responsive" pricing, and that effective January 1, 1987, the price under this contract was changed to $.734 per MMBTu.

As to the Nicor contract, it was also amended in 1984 to provide for "market-responsive" pricing, and Lone Mountain agrees that it is was bound by this amendment since it occurred prior to the time it acquired its interest in the contract. It also appears that the price under the Nicor contract was modified and that on June 14, 1986, the price provision was $1.14 per MMBtu. Natural claims that on July 1, 1986, the price under the Nicor contract was reduced from $1.14 to $.734 per MMBtu, and that Lone Mountain is bound by this price change.

The 1984 amendment of the Nicor contract required Natural to give written notice to the seller if it sought to lower the contract price and the June 30, 1986,

amendment to the Texoma contract required written notice of any changes in the pricing provisions. The parties agree that Lone Mountain did not receive notice of price changes under either contract.

The determination of whether the price changes are binding upon Lone Mountain depends upon when it obtained its interest in the gas contracts. Natural Gas claims that in order for Lone Mountain to have had any right of consent to price changes, it must have been a party to the contracts, and that it never became a party to the Nicor or Texoma contracts at all, since the assignments to Lone Mountain were assignments only of operating rights. In the alternative, Natural Gas claims that even assuming that the assignments of operating rights conferred party status to Lone Mountain, the assignments were not made until January 1987.

The farmout agreements between Lone Mountain and MidCon and Nicor provided that Lone Mountain would be entitled to receive assignments of operating rights upon the successful completion of a test well. The MidCon agreement provided that

After farmee has drilled and completed the test well to contract depth, and completed same in strict accordance with this agreement as a well capable of production of oil and/or gas, MidCon shall assign (its interest).... (Exhibit 15).

A similar agreement is found in the Nicor contract whereby Lone Mountain became entitled to an assignment:

Upon drilling the Earning Test Well, and completing same as producer or plugging and abandoning same as a dry hole, by Farmee, Farmor shall convey to Farmee all right, title and interest in and to the drillsite unit on which the well is located. (Exhibit 16).

The parties stipulated that Lone Mountain completed a producing well on June 14, 1986, but the paperwork was not completed, and the assignments were not executed until January 21, 1987. As previously noted, the Nicor assignment was made effec-

---

11. PTO, Damage Phase at 14, ¶ 11. The prices per MMBtu per month range from $3.164 in February, 1987 to $3.245 in December, 1988.

tive June 17, 1986, and the Texoma assignment was made effective as of the first day of production, which was June 14, 1986. (Exhibits 19, 20).

Under these facts, the trial court properly found that Lone Mountain obtained its interest in the Texoma contract on June 14, 1986, and thus was not bound by the June 30, 1986, price amendment, since it did not receive notice of the same. Likewise, even if Lone Mountain were bound by the pricing provision on that date, Natural was required to give written notice of the actual price change on January 1, 1987, and it failed to do so.

In like manner, Lone Mountain obtained its interest in the Nicor contract on June 17, 1986, at a time that the price under the Nicor contract was $1.14 per MMBtu, and that price should apply during the claim period, because Lone Mountain had no notice of any subsequent price change.[12]

Based on a total volume of 413,249 Mcf, and with the prices determined in accordance with the foregoing, the trial court entered judgment for Lone Mountain under the GEO contract of $583,005.22; under the Texoma contract of $291,502.56, and under the Nicor contract of $103,053.97, for a total damage figure of $977,561,64, not including prejudgment interest.

By separate order, the trial court awarded an additional sum of $173,780.35 as prejudgment interest, thus bringing the total award to $1,151,341.99.[13]

As noted by the trial court, in this diversity action, prejudgment interest is to be allowed if available under state law. *See U.S. Industries, Inc., v. Touche Ross & Co.*, 854 F.2d 1223, 1255 (10th Cir.1988), and it is widely recognized that in order to grant "just compensation" to a victim, when money has been wrongfully withheld, prejudgment interest may be awarded as an item of damage. See *Davis Cattle Co., Inc. v. Great Western Sugar Co.*, 544 F.2d

436 (10th Cir.1976), *cert. den.*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977).

Under Utah law, prejudgment interest may be awarded when " 'the loss is fixed as of a particular time and the amount of the loss can be calculated with mathematical accuracy' ", *U.S. Industries, Inc., supra*, 854 F.2d at 1255, quoting *Jorgensen v. John Clay & Co.*, 660 P.2d 229, 233 (Utah 1983), and prejudgment interest is appropriate even when the method of damage calculation is disputed. *Jack B. Parson Const. Company v. State*, 552 P.2d 107, 109 (Utah 1976).

The amount of damages awarded here was simply and mathematically calculated under the language of the contracts, the evidence, and the stipulations of counsel. Lone Mountain was entitled to be paid for all gas not taken in order to be made whole, and under Utah law, the rate of interest is to be governed by the statutory interest rate in effect on the date that the contract was entered into. *SCM Land Co. v. Watkins & Faber*, 732 P.2d 105, 108–09 (Utah 1986). The parties agreed that the statutory rate in effect as of the date of the contracts, April 18, 1980, was 6% per annum, and Natural does not dispute the mathematical calculation of interest based upon that rate.

There being no error, the Judgment is AFFIRMED.

---

**12.** Natural contends that Lone Mountain did not obtain its interest in the contracts until February 17, 1987, the date that the succession letters were sent by Lone Mountain to Natural. That was the date that the trial court set for the beginning of the *claim period,* and not the date upon which Lone Mountain obtained its interest in the contracts.

**13.** Amended Judgment entered December 28, 1990.