**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 28 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

SOUTHERN COLORADO MRI,
LTD., a Colorado limited partnership,

      Plaintiff - Appellee/
      Cross - Appellant.

    v.

MED-ALLIANCE, INC., formerly
known as ImageAmerica, Inc.,

      Defendant - Appellant/
      Cross - Appellee.

No. 97-1375 & 97-1393

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D. Ct. No. 95-Z-1211)**

---

Stanley L. Garnett (Stephen D. Gurr, with him on the briefs), Brownstein, Hyatt,
Farber & Strickland, P.C., Denver, Colorado, appearing for Defendant-
Appellant/Cross-Appellee.

Richard B. Podoll (Robert A. Kitsmiller, with him on the briefs), Podoll & Podoll,
P.C., Denver, Colorado, appearing for Plaintiff-Appellee/Cross-Appellant.

---

Before **TACHA**, **McWILLIAMS**, and **HENRY**, Circuit Judges.

---

**TACHA**, Circuit Judge.

This breach of contract diversity action arises from negotiations for the sale of a magnetic resonance imaging ("MRI") clinic by plaintiff Southern Colorado MRI, Ltd. ("SCMRI"), a Colorado partnership, to a new Tennessee partnership comprised of general partner MedAlliance, Inc., f/k/a ImageAmerica, Inc. ("MedAlliance") and limited partners St. Mary-Corwin Hospital ("St. Mary") and Parkview Episcopal Hospital ("Parkview"). The deal collapsed just prior to closing. SCMRI filed suit against MedAlliance, alleging the parties had formed a contract that MedAlliance had breached. After a bench trial, the district court, applying Colorado law, determined that the parties had formed a contract. It also found MedAlliance liable for 60% of the difference between the total sale price and the market price for the clinic, reasoning that MedAlliance had agreed in the contract to purchase 60% of the MRI clinic. We take jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's finding of contractual liability, but reverse its decision to limit damages to only 60% of the difference between sale price and market price.

**Background**

SCMRI is a partnership comprised of doctors and subsidiaries of Parkview and St. Mary. The partnership owned an MRI facility in Pueblo, Colorado, but, when Congress passed legislation in 1992 prohibiting physicians from referring patients to facilities in which the physicians owned an interest, SCMRI decided to

sell its facility. SCMRI formed a liquidation committee and solicited offers. In November 1992, the liquidation committee sent interested parties a "normalization letter" establishing certain parameters and requirements for any offer. MedAlliance and Medical Ventures, Inc. ("MVI") submitted proposals consistent with the normalization letter, and SCMRI decided to pursue further negotiations with these companies in late 1992. SCMRI was most interested in MedAlliance, which had made a higher initial proposal, but MedAlliance expressed dissatisfaction with the three year non-competition provision in the normalization letter. MedAlliance was concerned about potential competition from the Pueblo hospitals, St. Mary and Parkview. The parties agreed in January 1993 to avoid this problem by structuring the deal to have MedAlliance purchase the facility jointly with the Pueblo hospitals. Soon thereafter, SCMRI pursued negotiations exclusively with MedAlliance.

On May 19, 1993, SCMRI, MedAlliance, Parkview and St. Mary signed a letter of intent. While the letter stated explicitly that it was not an offer, it sketched the structure of the deal, proposed non-compete language conforming to that in the normalization letter, established a framework for further negotiation, and set forth a number of conditions precedent to the proposed sale. The letter anticipated MedAlliance, Parkview, and St. Mary forming a limited partnership to purchase the MRI clinic. MedAlliance, as general partner, would contribute 60%

of the assets, and the hospitals, as limited partners, would contribute 20% each.[1]

Significantly, the letter stated that "the respective rights and obligations of [MedAlliance], St. Mary, Parkview, and Seller remain to be defined in a definitive purchase agreement, into which this letter of intent shall merge, and in the other definitive documents contemplated hereby." Jt. App., vol. 4, at 1562. After execution of the letter of intent, MedAlliance performed an extensive due diligence inquiry. The parties also exchanged drafts of transactional documents. On May 27, 1993, MedAlliance's board of directors approved the transaction and authorized the company officers to negotiate and finalize the deal. MedAlliance completed its due diligence review in early July 1993.

On July 6, MedAlliance sent SCMRI a letter revising the purchase price from $4,250,000 to $3,500,000, based on its due diligence inquiry and current market conditions. The letter stated:

> <u>ImageAmerica is prepared to value SCMRI at $3,500,000 and to purchase 60% for $2,100,000 in cash</u>. This revised proposal is contingent upon a response from . . . SCMRI . . . no later than Monday, July 12, 1993 and a Closing Date no later than August 2, 1993 . . . . If either of these dates cannot be met, we will respectfully withdraw our offer as we cannot continue to "hold" the cash needed for this deal.

---

[1] The hospitals, through subsidiaries, each owned a 13.33% share of SCMRI. Under the terms of the deal, the hospitals would contribute this equity, valued at a combined $933,000, plus another $466,000 in cash, as their 40% share in the acquisition of the MRI clinic.

- 4 -

Jt. App., vol. 5, at 1731.  The next day, July 7, SCMRI sent a reply to MedAlliance to "formally accept the terms outlined in [MedAlliance's] letter of July 6th for [its] acquisition of the Southern Colorado MRI, Ltd." Id. at 1736.  The "acceptance" letter also indicated that counsel for the parties would work to "begin finalization of the Asset Purchase Agreement" and "complete . . . review" of the partnership agreement between MedAlliance and the hospitals.  Id.  While the closing documents were largely completed by this time, the parties continued to trade drafts of relevant documents through the rest of July.  The MedAlliance board of directors formally approved the acquisition and drafts of transactional documents on July 12, 1993.

On July 26, MedAlliance sent a letter requesting new language in the non-competition agreement.  The new language was substantially identical to that originally proposed by MedAlliance in late 1992 but which it had abandoned after the parties had revised the deal to include the hospitals.  SCMRI rejected the proposed change and unsuccessfully sought to compromise with MedAlliance in an effort to salvage the deal.  The deal did not close on August 2, as planned, and MedAlliance broke off negotiations in late September.  After it became apparent that the deal with MedAlliance and the hospitals would not reach fruition, SCMRI approached MVI to determine whether it was still an interested buyer.  On October 11, 1993, MVI offered $2,125,000 for the MRI clinic.  SCMRI rejected

this offer and continued to operate the facility until it closed at the end of 1995. The partnership netted $2,041,184 from the operation of the facility from August 1993 through December 1995.

SCMRI filed suit on May 19, 1995, alleging breach of contract, promissory estoppel, and breach of preliminary agreement to negotiate in good faith. The district court dismissed the promissory estoppel and good faith claims, but, after conducting a bench trial, the court concluded in an oral ruling that the parties had formed a contract. The court based its ruling on the course of dealing between the parties, the circulation of transactional documents, and an exchange of letters between MedAlliance and SCMRI on July 6 and 7, 1993. It found these letters, the drafted documents, and the parties' discussions established the existence of a contract on July 7. Additionally, the court concluded that the letter of intent, which clearly contemplated an "executed" asset purchase agreement to finalize the deal, did not prevent the parties from contracting because, according to the court, the parties either waived or amended this provision of the letter of intent. Since the contract existed as of July 7, the court found MedAlliance's attempt to change the non-compete language later in the month constituted a breach.

Once it determined MedAlliance had breached the contract, the court concluded that Colorado law required that the plaintiff receive expectancy contract damages, measured at the time of breach. The court used the MVI

October offer of $2,125,000 as the market price at the time of breach. It then took 60% of the contract price of $3,500,000 and subtracted 60% of the market price to arrive at the damage award of $825,000. The district court limited the damages to 60% because it determined that MedAlliance was responsible only for that portion of the contract price. It stated: "[T]he fact that the two hospitals were going to in effect purchase the remaining 1.4 million . . . appears to this Court to be separate and distinct from the defendant's breach of contractual duties." Jt. App., vol. 8, at 3249.

MedAlliance appeals the district court's finding of a contract and calculation of damages. It argues that: (1) the district court erred in concluding the parties formed a contract, especially in light of the letter of intent's provision that the deal is final only after the execution of an asset purchase agreement; (2) the letter of intent's purchase agreement requirement bound the parties and the court erred in finding that they waived this provision; and (3) the district court should have offset the damages by the amount of profit SCMRI received for continuing to operate the facility. SCMRI cross-appeals on the issue of damages, claiming the district court erred in awarding only 60% of expectancy damages. According to SCMRI, it should have received the full $1,375,000 in damages because MedAlliance's breach destroyed the entire deal and that result was foreseeable by all parties.

## I. Contract Formation

We begin with defendant's arguments regarding contract formation. We review the district court's findings of fact for clear error. See Fed. R. Civ. P. 52(a); Unicover World Trade Corp. v. Tri-State Mint, Inc., 24 F.3d 1219, 1221-22 (10th Cir. 1994). Whether parties have entered into a contract is a question of fact. See I.M.A., Inc. v. Rocky Mountain Airways, Inc., 713 P.2d 882, 887 (Colo. 1986); Moore & Assocs. Realty v. Arrowhead at Vail, 892 P.2d 367, 372 (Colo. Ct. App. 1994); see also Frymire v. Ampex Corp., 61 F.3d 757, 769 (10th Cir. 1995) (applying Colorado law). Additionally, whether parties have waived a provision of a contract also constitutes a factual determination. See Moore, 892 P.2d at 372.

MedAlliance, SCMRI, and the hospitals entered into a letter of intent that included various provisions anticipating the "execution of a definitive purchase agreement." Jt. App., vol. 4, at 1560. In fact, the letter of intent listed the execution of such an agreement as a condition to closing. MedAlliance asserts that this provision was still in force during the negotiations in July 1993 and expressed an intent by the parties not to be bound until they formally signed all the documents at a closing.

Colorado law makes clear that, even when parties initially agree in writing not to be bound in contract until they sign an asset purchase agreement, those

parties may later bind themselves without signing a formal agreement. See

Moore, 892 P.2d at 372 ("[E]ven if the parties agree to formalize their agreement

by a writing, the determination whether they became bound by their agreement

before they execute such a writing is dependent upon their intent.") (citing

Coulter v. Anderson, 357 P.2d 76 (Colo. 1960)). Parties to an initial agreement

may modify or waive it in part or in whole by subsequent words and actions. See

id. The touchstone inquiry in these situations is whether the parties manifested an

intent to be bound in contract. See id. Therefore, even where a letter of intent

exists, the ultimate question of whether the parties formed a contract remains "a

question of fact to be determined by all of the surrounding circumstances." Id.

The district court found that the actions of the parties, the drafting of the

transaction documents, and especially the letters of July 6 and 7, indicate the

parties' willingness to be bound on July 7. The court concluded that the letters,

written just after completion of due diligence review, reflected a desire by the

parties to reach final agreement immediately. In fact, several witnesses at trial

testified that they understood the parties had reached a binding agreement.

Additionally, the court found the material terms of the contract, including price,

non-competition language, closing date, and structure of the deal, were settled by

July 7, 1993. Moreover, the actions of the parties after July 7 provided the court

with corroborating support for a finding of contract. During this time, the parties

circulated closing documents, and MedAlliance established a new buyer subsidiary, arranged for financing from its bank, and reviewed employee benefit programs at SCMRI in preparation for assuming ownership.

"A finding of fact is not clearly erroneous unless 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.'" Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990) (quoting LeMaire ex rel. LeMaire v. United States, 826 F.2d 949, 953 (10th Cir. 1987)). The district court's findings are amply supported in the record, and we find no clear error in its conclusion that the parties had formed a contract.

Our decision regarding contract formation also controls the question of whether the parties were still bound by the letter of intent's requirement for a written asset purchase agreement.[2] The district court found that the parties, in their actions prior to July 6 and in the exchange of letters on July 6 and 7, either waived or amended the original agreement regarding the execution of a writing. As noted earlier, both conclusions are ones of fact, which we review for clear error. We find no error. The record contains evidence supporting the conclusion that the parties intended to be bound in contract after their exchange of letters on

_____

[2] Some dispute exists as to whether this provision of the letter of intent was binding on the parties. In light of our disposition regarding waiver and/or amendment, we need not decide this matter.

- 10 -

July 6 and 7. MedAlliance's letter demands acceptance of "[t]his revised proposal" by July 12, stating that if SCMRI cannot respond by that date, "we will respectfully withdraw our *offer* as we cannot continue to 'hold' the cash needed for this deal." Jt. App., vol. 5, at 1731 (emphasis added). SCMRI's July 7 response accepted MedAlliance's offer and agreed to begin finalization of the necessary documents. By expressing an intent to be bound on July 7, 1993, the parties implicitly waived or amended any prior agreement that an asset purchase document was necessary to complete the contract. See Moore, 892 P.2d at 372 (stating that a written provision may be waived, either expressly or by implication).

MedAlliance correctly notes that an implied waiver of a contractual right must "be free from ambiguity and clearly manifest the intention not to assert the benefit." Tripp v. Parga, 847 P.2d 165, 167 (Colo. Ct. App. 1992); Burman v. Richmond Homes Ltd., 821 P.2d 913, 919 (Colo. Ct. App. 1991); Richmond v. Grabowski, 781 P.2d 192, 195 (Colo. Ct. App. 1989). To the extent the district court's decision relied upon a waiver theory, the record supports a conclusion that SCMRI and MedAlliance clearly and unambiguously waived their right to be bound only by a written purchase agreement. Cf. Burman, 821 P.2d at 919-20 (finding plaintiff impliedly waived provision of real estate purchase agreement requiring delivery of commitments for title insurance policies prior to closing

because plaintiff did not object to failure to deliver commitments); Richmond, 781 P.2d at 195 (finding contractor did not waive contractual provision that home owner purchase property insurance for work where only evidence of waiver was that contractor began work without receiving a copy of the owner's insurance policy). Therefore, we conclude that the district court committed no reversible error in finding that a valid contract existed between MedAlliance and SCMRI as of July 7, 1993.

## II. Damages

We review the amount of a damage award for clear error and questions of law de novo. See, e.g., Dill v. City of Edmond, Okla., 155 F.3d 1193, 1209 (10th Cir. 1998). The methodology a district court uses in calculating a damage award, such as determining the proper elements of the award or the proper scope of recovery, is a question of law.[3] See Bartlett v. New York State Bd. of Law Exam'rs, 156 F.3d 321, 331-32 (2d Cir. 1998) ("We review the method of

---

[3] Although this court has previously stated that "'in reviewing the district court's methodology in calculating damages, all we require is a reasonable basis for computation and reliance on the best evidence available in the circumstances,'" Lone Mountain Production Co. v. Natural Gas Pipeline Co. of Am., 984 F.2d 1551, 1558 (10th Cir. 1992) (quoting Furr v. AT&T Technologies, Inc., 824 F.2d 1537, 1548 (10th Cir. 1987)), in those cases we were actually referring to the factual inputs used in calculating damages rather than the underlying legal methodology, see Lone Mountain, 984 F.2d at 1558 (involving quantity of gas); Furr, 824 F.2d at 1548 (challenging amount that should be used as base salary in back pay award). We now clarify our standard of review.

calculation of damages *de novo* and the actual calculation of damages for clear error." (internal citations omitted)); <u>In re Air Crash Disaster Near Cerritos, Cal., on August 31, 1986</u>, 982 F.2d 1271, 1275 (9th Cir. 1992) ("When a legal determination such as the proper elements of an award of damages is reviewed, a *de novo* standard is applied.")

**A.**

MedAlliance assigns error to the district court because it did not subtract from the damages calculated by the court the $2,041,184 in profits SCMRI realized after the breach. Defendant asserts that SCMRI received an improper double recovery because it was awarded expectancy damages and also retained post-breach profits from the clinic. We disagree. Colorado follows the general contract law rule that a benefit to the plaintiff as a result of a breach reduces the plaintiff's damages accordingly. <u>See</u> <u>Wells Aircraft Parts Co. v. Allan J. Kayser Co.</u>, 194 P.2d 326, 330 (Colo. 1947); <u>Wickland v. Snyder</u>, 565 P.2d 976, 977 (Colo. Ct. App. 1977); <u>see also</u> Restatement (Second) of Contracts, § 347(c) & cmt. d (1981); 22 Am. Jur. 2d <u>Damages</u> § 522 (1988). However, this rule is not implicated in the instant case because the district court's method of calculating damages takes into account SCMRI's post-breach profits.

Breach of contract damages are generally measured at the time of breach. <u>See</u> <u>McCoy v. Riley</u>, 771 P.2d 25, 26-27 (Colo. Ct. App. 1989). The district court

followed this rule, calculating damages by subtracting the market price at breach from the contract price. It used MVI's offer as the measure of market price.[4] MVI's offer reflected what a willing buyer would have paid for the clinic as a going concern at the time of the breach, and that present valuation would have necessarily incorporated expected future profits. See Protectors Ins. Serv., Inc. v. United States Fidelity & Guar. Co., 132 F.3d 612, 617 (10th Cir. 1998) (applying Colorado law and noting that "[t]he prospect of future earnings is considered in arriving at the fair market value of a given business"). Thus, it would be improper to subtract both the future actual profits and MVI's offer price from the contract price in calculating expectancy damages. See id. at 617 & n.4. Conceptually, the discounted value of SCMRI's post-breach actual profits merely represents an alternative valuation of SCMRI for purposes of calculating damages. See id. at 617. Furthermore, MedAlliance has no cause to complain that the district court did not value SCMRI by reference to its post-breach actual profits, for its profits were lower than the offer made by MVI. In sum, the district court properly used MVI's offer as the market price in calculating expectancy damages and correctly rejected defendant's argument that the actual profits should

---

[4] Neither party disputes that the $2,125,000 MVI offer is an accurate value of SCMRI as a going concern as of the date of the breach.

- 14 -

have also reduced SCMRI's recovery.[5]

**B.**

On cross-appeal, SCMRI argues that the district court erred in awarding only 60% of the loss that resulted from the failed deal. We agree. Colorado law generally provides for damages that "place the parties in the same financial position they would have occupied had the contract terms been fulfilled." See Colorado Nat'l Bank of Denver v. Friedman, 846 P.2d 159, 174 (Colo. 1993) (quoting Republic Nat'l Life Ins. Co. v. Red Lion Homes, Inc., 704 F.2d 484, 488 (10th Cir. 1983)). In carrying out this requirement, the court must apply the familiar principle of foreseeability that dates back to Hadley v. Baxendale, 9 Exch. 341 (Eng. 1854). See Uinta Oil Refining Co. v. Ledford, 244 P.2d 881, 885 (Colo. 1952) ("Damages must be such as may reasonably be supposed to have been within the contemplation of the parties to the agreement at the time of the execution thereof, and the natural and proximate consequences of a breach thereof."); Western Union Tel. Co. v. Trinidad Bean & Elevator Co., 267 P. 1068, 1069 (Colo. 1928); Republic Nat'l, 704 F.2d at 488. We find that the district court failed to apply this principle and therefore erred as a matter of law when it determined damages.

---

[5] In essence, defendant fails to appreciate that no double recovery occurred because SCMRI rejected and hence never received the $2,150,000 offered by MVI.

- 15 -

It is unclear whether the district court found a contract between only MedAlliance and SCMRI or between those two parties and the hospitals.[6] We need not resolve this matter, however, for the loss of the full value of the deal was clearly foreseeable by all parties, regardless of whether the hospitals' purchase constituted a separate contract or a part of one large agreement. If a contract existed among all four parties, the defendant's breach affected the entire contract. If the contract was just between two parties, they specifically made it in the context of an overall deal that included the hospitals, as the letter of intent, the testimony of the parties, and the circulation of a draft partnership agreement show. MedAlliance and SCMRI would not have entered into a contract for 60% of the clinic without an assurance that the hospitals would purchase the other 40%. Conversely, the hospitals would not have contributed their 40% to the purchase of SCMRI until MedAlliance agreed to buy the remaining 60%. Consequently, the collapse of the entire deal was foreseeable and proximately resulted from MedAlliance's breach. Cf. Uinta Oil, 244 P.2d at 884-85 (upholding award of lost profits when they were a foreseeable consequence of

---

[6]In its July 6 offer letter, MedAlliance declared it was "prepared to value SCMRI at $3,500,000 and to purchase 60% for $2,100,000 in cash." Jt. App., vol. 5, at 1731. The district court stated: "[T]he fact that the two hospitals were going to in effect purchase the remaining 1.4 million . . . appears to this Court to be separate and distinct from the defendant's breach of contractual duties." Jt. App., vol. 8, at 3249. From the district court's statement, one might assume it found only a contract between plaintiff and defendant.

breach of exclusive distributorship agreement); <u>Republic Nat'l</u>, 704 F.2d 488-89 (applying Colorado law and finding lost profits award for buyer appropriate when seller breached contract to convey residential development lots and seller knew buyer had plans to develop property).  MedAlliance's failure to perform denied SCMRI the benefit of the entire deal, not just MedAlliance's 60% share.

In order to put SCMRI in as good a position as it would have been had the contract been performed, it should receive the full measure of expectancy damages.  The district court found that the market price at the time of breach was the MVI offer of $2,125,000.  Accepting this finding, we hold that the proper measure of damages for SCMRI is $1,375,000, not $825,000.

The judgment of the district court is AFFIRMED in all respects except for the calculation of damages awarded to the plaintiff.  The damage award is REVERSED, and this case is REMANDED for entry of judgment consistent with this opinion.