JAMES H. MOORE & ASSOCIATES RE-ALTY, INC., a Colorado corporation, Plaintiff–Appellant,

v.

ARROWHEAD AT VAIL, a Colorado Joint Venture, and Arrowhead at Vail, Inc., a Delaware corporation, Counterclaim-ants and Defendants–Appellees,

and

James H. Moore, III, Counterclaim Defendant and Appellant.

Nos. 92CA1501, 93CA0031.

Colorado Court of Appeals, Div. III.

June 30, 1994.

As Modified on Denial of Rehearing Aug. 25, 1994.

Certiorari Denied March 20, 1995.

* Sitting by assignment of the Chief Justice under provisions of the *Colo.Const.* art. VI, § 5(3), and

§ 24–51–1105, C.R.S. (1993 Cum.Supp.).

Cooper & Kelley, P.C., Thomas B. Kelley, John R. Mann, Denver, for plaintiff-appellant and counterclaim defendant and appellant.

Ireland, Stapleton, Pryor & Pascoe, P.C., Tucker K. Trautman, Scot M. Peterson, Denver, for counterclaimants and defendants-appellees.

Opinion by Judge CRISWELL.

In a dispute relating to two alleged agreements respecting real estate developments near Vail, plaintiffs, James H. Moore & Associates Realty, Inc., and James H. Moore, III, (collectively Moore) appeal the summary judgment entered in favor of defendants, Arrowhead at Vail Joint Venture and Arrowhead at Vail, Inc., (collectively Arrowhead). Moore also appeals the judgment entered in favor of Arrowhead on its counterclaim for abuse of process. We affirm in part, reverse in part, and remand for further proceedings.

Moore has been involved in the construction of residential and commercial projects in the Vail area. Arrowhead is a joint venture which developed the Arrowhead at Vail resort community. Prior to the relevant events considered here, these parties had successfully implemented an agreement under which Moore developed a condominium project on a parcel purchased from Arrowhead.

Later, the parties commenced negotiations for Moore to complete additional phases of this development on several adjacent parcels (the Second Seasons project). In November 1988, Arrowhead's president signed a letter of intent drafted by Moore's counsel which summarized the basis upon which Moore was to purchase one lot from Arrowhead and was to be receive an option to purchase a second lot for this purpose. Moore asserts that, several weeks later, the parties also orally agreed that Moore was to be granted an additional option on a third lot under the same terms as were summarized in the previous letter of intent. This second agreement was allegedly confirmed by another letter sent by Arrowhead's president to Arrowhead's attorney with a copy provided to Moore.

However, while the parties later exchanged various drafts of a formal purchase agreement for this Second Seasons project, no such agreement, reflecting the entire Second Seasons transaction, was ever signed by the parties.

At about this time, the parties also began negotiations with respect to Moore's purchase of three additional lots from Arrowhead for another retail and residential development (the Village Court project). Because the successful development of the Village Court retail space was necessary in order successfully to market the Second Seasons residential units, the parties purportedly agreed to put the Second Seasons project on hold until the Village Court was developed.

Moore asserts that, by mid-July 1989, there was an oral agreement on all essential terms for the Village Court project; such agreement is allegedly reflected in a July 1989 letter of intent and by two later letters from Arrowhead to its counsel.

The July 1989 letter of intent provided that, in the absence of any express agreement to the contrary, the Village Court purchase agreement would be subject to the same terms as contained in a former contract between the parties. It also provided, however, that their agreement would not be binding unless a formal written agreement was executed by the parties within 30 days of the date of the letter of intent. The letter of intent was not signed by an Arrowhead representative; however, in later letters to its counsel, Arrowhead referred to that letter and requested that its terms be incorporated into a formal agreement.

It is uncontroverted that the parties continued to negotiate with respect to the Village Court project for several months after the 30-day period referred to in the letter of intent. And, during this period of negotia-

tions, Arrowhead and Moore undertook several actions which contemplated the successful implementation of an agreement between them.

The parties exchanged several drafts of a formal agreement, the last in late October 1989, which proposed some changes in the terms reflected in the Village Court letter of intent. However, no such formal document was ever signed by the parties.

In November, negotiations between the parties became strained because of their disagreement with respect to the subordination of liens on the property. In early December, Arrowhead notified Moore that it considered their negotiations at an end and that it was withdrawing any offer to sell the property to Moore.

In April 1990, after learning that Arrowhead was negotiating to sell the same property to another developer, Moore filed the complaint in this action. That complaint contained, *inter alia*, claims for specific performance or damages for breach of the two purported agreements. And, in conjunction with the filing of the complaint, Moore recorded notices of lis pendens with respect to the realty at issue.

In response, Arrowhead asserted a counterclaim against Moore for abuse of process and slander of title, both of which were based upon Moore's filing of the notices of lis pendens.

After the parties had engaged in discovery efforts, the trial court granted summary judgment in favor of Arrowhead, dismissing all of Moore's claims for relief. Arrowhead then moved for release of the lis pendens, which Moore released by disclaimer shortly thereafter.

Arrowhead's counterclaims were considered in a bench trial, after which the trial court dismissed Arrowhead's slander of title claim, but entered judgment in its favor on the abuse of process claim. It awarded Arrowhead some $1,900,000 as damages under this claim, including attorney fees incurred in defense of Moore's claims and in the trial of its counterclaim. Such fees were also awarded against certain of Moore's counsel.

## I.

Moore first argues that the trial court erred in granting summary judgment in favor of Arrowhead on the alleged Second Seasons and Village Court contracts. We agree in part.

■ In reviewing the propriety of the trial court's grant of summary judgment, we must determine whether there is a clear showing that no issue of material fact exists and whether Arrowhead is, therefore, entitled to judgment as a matter of law. *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (Colo.1988); *Gifford v. City of Colorado Springs*, 815 P.2d 1008 (Colo.App.1991). In order to make this determination, we must resolve all doubts as to the existence of material factual issues against Arrowhead and give to Moore the benefit of any favorable inference that may be drawn from the disclosed facts. *Kaiser Foundation Health Plan v. Sharp*, 741 P.2d 714 (Colo.1987).

### A. The Alleged Second Seasons Agreement.

■ Because both alleged contracts here were for the conveyance of interests in land, it was required that there be writings expressing the consideration for each sale, signed by Arrowhead. Section 38–10–108, C.R.S. (Repl.Vol. 16A). In dismissing Moore's claim with respect to the Second Seasons realty, the trial court concluded that the two writings relied upon by Moore (the November 1988 letter of intent and a later letter from Arrowhead's vice-president) were too indefinite to allow their enforcement. We agree with this conclusion.

The November 1988 letter of intent provides that Moore is to purchase lot 8 and is to be granted an option to purchase lot 7, to be exercised within one year after its purchase of lot 8. No mention is made regarding *lot 6* in this letter.

The second letter makes fleeting reference to an option to purchase lot 6, but sets forth no terms for the exercise of any such option. Further, it does not state that the terms for this option were to be the same terms as the parties had purportedly established for the option for lot 7.

Likewise, the letter of intent fails to set forth the amount of any purchase price for the acquisition of either lot 7 or lot 8. While the letter provides that Moore was to pay a specified price for each condominium unit that Moore was to build on the lot, it neither establishes the number of units to be built by Moore nor provides any formula for determining such number. It is impossible to determine from this document, therefore, the total purchase price to be paid for the lot to be conveyed.

Hence, because these two documents, whether considered singly or collectively, omitted material terms, they cannot be enforced. *See Ross v. Purse,* 17 Colo. 24, 28 P. 473 (1891); *compare Aceste v. Wiebusch,* 74 A.D.2d 810, 425 N.Y.S.2d 369 (1980) (term "$89,000 net" was not sufficient expression of price to satisfy statute of frauds, as there was nothing further in memorandum to explain meaning) *with Dahm v. Miele,* 136 A.D.2d 586, 523 N.Y.S.2d 851 (1988) (term, which set forth formula by which agreed price could be readily ascertained, satisfied statute of frauds).

## B. The Alleged Village Court Contract

■ Moore next contends that the trial court erred in granting summary judgment for Arrowhead on its claims based on the alleged Village Court contract. We agree.

The primary thrust of Arrowhead's motion for summary judgment was that no enforceable contract for the Village Court property had been formed because the parties never executed the formal written agreement called for by the letter of intent. The letter of intent provides that:

Unless an Agreement of Purchase and Sale shall be entered into within 30 days of the date of full execution hereof, incorporating the terms as stated herein with such modifications as shall be mutually acceptable to the parties hereto, this Letter of Intent shall become null and void and of no further force or effect. The parties agree to deal in good faith to secure execution of an agreement of Purchase and Sale upon such terms and conditions as are set forth herein within such thirty (30) day period.

Moore responds that this detailed, multi-page letter of intent, which incorporates by reference the terms of a prior development contract between the parties, together with the later letters from Arrowhead to its counsel, contain all the essential terms of the parties' contract and, as such, collectively constitute the memorandum required to satisfy the statute of frauds. It asserts that the parties, either expressly or through their conduct, waived the condition in the letter of intent for a more formal writing and that the later exchange of additional documents were only proposals to modify the original agreement, which were never agreed upon.

In support of such assertions, Moore presented affidavits and other evidentiary materials establishing that:

(1) During the discussions with respect to the various drafts of formal agreements, counsel for Arrowhead specifically represented to Moore's counsel that the requirement for a formal agreement within 30 days was "no longer a problem."

(2) Arrowhead ran newspaper advertisements in Vail in July and August 1989, representing that: "The Village is a development of Moore and Co."

(3) In August 1989, Arrowhead's Vice President reported to Arrowhead's board of directors that the sale of three lots to Moore was being finalized, with construction to begin in the fall.

(4) In September, Arrowhead's vice president advised the board that the Village Court sale was complete and that closing on two of the lots was expected in November 1989.

(5) In October, Arrowhead's design committee approved Moore's schematics and plans for the development.

(6) Arrowhead prepared and submitted to the county for approval an amended subdivision plat for the lots, upon which the Village Court development was to be placed, which plat was based on Moore's plans for the development.

(7) Arrowhead secured a commitment for a title insurance policy on the lots showing Moore as the owner and insured party.

(8) An internal Arrowhead memorandum in October states that the Village Court deal with Moore "appears to be finalized" and that legal action could result if Arrowhead now chose to "terminate negotiations."

This evidence was, in our view, sufficient to create a genuine factual issue with respect to whether the parties waived the requirement for a more formal written agreement.

On its face, the Village Court letter of intent, which was adopted by a later writing signed by an Arrowhead agent, contains all the essential terms for a binding agreement; unlike the Second Seasons' documents, there are no material elements missing. It is, therefore, only if the requirement for a formal written agreement prevented the formation of a contract between the parties that that letter of intent is unenforceable.

■ Generally, whether a contract exists is a question of fact to be determined by all of the surrounding circumstances. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882 (Colo.1986); *L.U. Cattle Co. v. Wilson,* 714 P.2d 1344 (Colo.App.1986).

■ Further, even if the parties agree to formalize their agreement by a writing, the determination whether they became bound by their agreement before they execute such a writing is dependent upon their intent. *Coulter v. Anderson,* 144 Colo. 402, 357 P.2d 76 (1960); *Mohler v. Park County School District,* 32 Colo.App. 388, 515 P.2d 112 (1973). And, the issue of intent is one that can only rarely be resolved by means of a summary judgment. *Wolther v. Schaarschmidt,* 738 P.2d 25 (Colo.App.1986).

■ In addition, generally, a written contract may be modified by a later oral agreement, *Cordillera Corp. v. Heard,* 41 Colo.App. 537, 592 P.2d 12 (1978), *aff'd,* 200 Colo. 72, 612 P.2d 92 (1980), even in the face of a specific provision in the written agreement that all modifications must be in writing. *Colorado Investment Services, Inc. v. Hager,* 685 P.2d 1371 (Colo.App.1984). This is true, also, of a contract which is subject to the statute or frauds, so long as the oral modification does not relate to a material condition of that contract. *Burnford v. Blanning,* 189 Colo. 292, 540 P.2d 337 (1975);

*Colorado Investment Services, Inc. v. Hager, supra.*

■ In addition, an express provision in a written agreement may be waived, either expressly or by implication. *Ebrahimi v. E.F. Hutton & Co.,* 794 P.2d 1015 (Colo.App. 1989). Such a waiver may be implied if a party engages in conduct which manifests an intent to relinquish the right or privilege or acts inconsistently with its assertion. *Cooper v. First Interstate Bank of Denver, N.A.,* 756 P.2d 1017 (Colo.App.1988). And, the question of waiver is a question of fact which is also not normally appropriate for summary judgment. *See Burman v. Richmond Homes Ltd.,* 821 P.2d 913 (Colo.App.1991).

■ Finally, if the requirement for a more formal writing here was waived or abandoned by the parties, so that the letter of intent was binding upon them, the fact that they continued to negotiate over additional terms would not affect the binding nature of their previous agreement. *See Jarnagin v. Busby, Inc.,* 867 P.2d 63 (Colo. App.1993); *Marcor Housing Systems, Inc. v. First American Title Co.,* 41 Colo.App. 90, 584 P.2d 86 (1978) *aff'd in part, rev'd in part on other grounds sub nom., O'Hara Group Denver, Ltd. v. Marcor Housing Systems, Inc.,* 197 Colo. 530, 595 P.2d 679 (1979).

Here, the provision that was allegedly waived did not contain any terms establishing the conditions of the proposed sale and was not, therefore, a material condition of that sale. *See Colorado Investment Services, Inc. v. Hager, supra.* In addition, the evidence relied upon by Moore was sufficient to create a genuine issue as to whether the parties waived, either expressly or impliedly, the requirement in the Village Court letter of intent for a more formal written agreement. Hence, the trial court erred in entering summary judgment with respect to this claim.

## II.

■ Moore also asserts that the trial court erred as a matter of law in concluding, after a bench trial, that Moore's filing of notices of lis pendens against the property described in its claims constituted an abuse

of process. We also agree with this assertion.

■ A claim for abuse of process includes at least the following three elements: (1) an ulterior purpose for the use of a judicial proceeding; (2) willful action in the use of that process which is not proper in the regular course of the proceedings; and (3) resulting damages. *See Aztec Sound Corp. v. Western States Leasing Co.*, 32 Colo.App. 248, 510 P.2d 897 (1973).

■ Further, if the claim is based upon an action that constitutes an exercise of a First Amendment right, such as the right to petition, a claimant must also prove that the action taken lacked a reasonable factual basis, or if so supported, it lacked a cognizable basis in law. *Protect Our Mountain Environment, Inc. v. District Court*, 677 P.2d 1361 (Colo.1984). *See also Henry v. Kemp*, 829 P.2d 505 (Colo.App.1992) (suggesting that this fourth element must be established in *any* abuse of process claim).

The parties here have both presented substantial argument upon the question whether Arrowhead was required to establish this fourth element in order to prevail upon its abuse of process claim. Also, an issue has been raised concerning whether a litigant who files a notice of lis pendens enjoys a qualified privilege for purposes of an abuse of process claim, which was the issue reserved by our supreme court in *Westfield Development Co. v. Rifle Investment Associates*, 786 P.2d 1112 (Colo.1990).

However, we conclude that we need not address either of those issues because, in our view, the evidence here wholly failed to demonstrate that Moore's filing of the notices of lis pendens was undertaken in any improper manner.

■ Use of a legal proceeding in an improper *manner* is an essential element of an abuse of process claim. *Institute for Professional Development v. Regis College*, 536 F.Supp. 632 (D.Colo.1982) (applying Colorado law).

Thus, although the litigant's motive may be important in determining whether there was an "ulterior purpose" for the use of the process, it still must be established that, viewed objectively, there was an improper *use* of the process. Classic examples of the requisite improper use include the use of process to accomplish a coercive goal which is not the intended legal purpose of the process. *See Aztec Sound Corp. v. Western States Leasing Co., supra* (defendant used replevin action not properly to regain property, but improperly as a means of forcing plaintiff to pay sum of money not due); *Scozari v. Barone*, 546 So.2d 750 (Fla.Ct.App.1989) (filing of lien and lis pendens against father's home as a bargaining chip to compel father to negotiate in child custody dispute).

In *Institute for Professional Development v. Regis College, supra*, 536 F.Supp. 632, 635, it was explained that:

> If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, *even if the plaintiff had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim. Further, while the ulterior motive may be inferred from the wrongful use of the process, the wrongful use may not be inferred from the motive* (citations omitted). (emphasis supplied)

*See also* Restatement (Second) of Torts § 682 comment b (1977) ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, [although] there is an incidental motive of spite or an ulterior purpose. . . .").

■ The filing of a notice of lis pendens is proper if the claimant shows that the claim asserted relates to a right of possession, use, or enjoyment of real property. Section 38–35–110, C.R.S. (1982 Repl.Vol. 16A); C.R.C.P. 105(f). *Cf.* § 38–35–110, C.R.S. (1993 Cum.Supp.) (effective March 20, 1992). *See Clopine v. Kemper*, 140 Colo. 360, 344 P.2d 451 (1959); *Salstrom v. Starke*, 670 P.2d 809 (Colo.App.1983).

■ The intended purpose for filing a notice of lis pendens is to provide notice to anyone who may acquire an interest in the property during the pendency of the litigation so that he or she will be bound by its outcome. *Perry Park Country Club, Inc. v.*

*Manhattan Savings Bank,* 813 P.2d 841 (Colo.App.1991). This insures that judgments affecting interests in real property are not undermined by transfers during litigation. *Maddalone v. Wilson,* 764 P.2d 403 (Colo.App.1988). Hence, one who acquires an interest in property, which is subject to a claim in litigation, takes the interest purchased subject to such claim as finally determined. *Hammersley v. District Court,* 199 Colo. 442, 610 P.2d 94 (1980).

Here, the only use that Moore made of the notices of lis pendens was the use intended for such process—to give notice to the world of the claims asserted against the property so that the rights of third parties would not attach prior to the complete adjudication of the claims being asserted. From a practical standpoint, the filing of such a notice might well have rendered the title to the property against which the claims were being made unmarketable pending such adjudication. But, that result came about because of the very nature of the notices, not from any improper use them.

The trial court in this case found that, at the time the notices of lis pendens were filed, there was no impropriety involved and that the notices filed were "supported by plausible contentions that [Moore] was a victim and that a contract could be proven." This circumstance distinguishes Moore's actions here from those reviewed in *Salstrom v. Starke, supra,* in which plaintiff filed a notice of lis pendens knowing that he had no claim to any interest in the property that was the subject of the notice.

According to the trial court, however, Moore's persistence in relying upon the notices and in failing to "release" them after Arrowhead's summary judgment was granted, but before any final judgment had been entered by the trial court, caused its "predominant motives" to become improper "at some point." However, the trial court made no finding of any improper use of the notices; its findings related solely to Moore's motives. And, an improper use cannot be inferred simply from an improper motive; there must be, at the least, an attempt to *use* the process improperly. *See Institute for Professional Development v. Regis College, supra.*

Further, C.R.C.P. 105(f), which governed the expiration of the effect of the notices at all times relevant to this dispute, does not require a party filing a notice of lis pendens to release that notice prior to the entry of final judgment. On the contrary, that rule specifically provides that such notice will be in effect for a period of 45 days after the entry of such a judgment. C.R.C.P. 105(f)(1). The purpose for this provision is to allow a claimant time within which either to record a transcript of a favorable judgment or to appeal, in which latter event the notice remains in effect during the appeal. C.R.C.P. 105(f)(4); *Maddalone v. Wilson, supra.*

Hence, the failure of Moore to "release" the notices of lis pendens prior to the entry of final judgment was not an improper use of the notice procedures. Such failure was in complete harmony with the specific provisions regulating these procedures.

We conclude, therefore, that the findings of fact adopted by the trial court, as well as the evidence submitted in support of those findings, were insufficient, as a matter of law, to support any judgment against Moore on Arrowhead's abuse of process claim.

### III.

The trial court considered Arrowhead's assertion that it was entitled to attorney fees under C.R.C.P. 11 and § 13–17–102, C.R.S. (1987 Repl.Vol. 6A), because of Moore's alleged maintenance of frivolous and groundless claims, simultaneously with the trial of Arrowhead's abuse of process counterclaim. In doing so, it noted that the attorney fees requested were included in the judgment awarded Arrowhead under that counterclaim, but it concluded that at least a portion of the fees awarded under that counterclaim would also have been awardable under the rule or statute. Moore contends that such determination was erroneous. We agree.

The trial court's sanctions in the form of an award of attorney fees were also imposed upon certain of Moore's counsel, based, in part, upon a failure to engage in proper discovery. However, the propriety of the

award of fees against counsel is the subject of a separate appeal and, therefore, the judgment of this court with respect to Moore shall have no effect upon the award against counsel.

In contrast, the trial court's award against Moore was based upon its determination that, while Moore's initiation of the litigation was proper, the claims should have been dismissed when discovery disclosed that those claims had no evidentiary support and were dismissed on a summary basis.

However, because we have concluded that the court erred in determining that there was no factual support for the claim based on the Village Court contract, the court's award of fees against Moore under § 13–17–102 cannot be sustained either under that statute or under C.R.C.P. 11. And, because the court made no attempt to apportion the fees incurred in defending against both claims, the entire judgment for fees must be reversed. At the completion of the proceedings herein ordered to be undertaken, the court may reconsider an award of fees with respect to the Second Seasons claim.

The judgment dismissing Moore's claim based on the alleged Second Seasons agreement is affirmed. The judgment dismissing Moore's claim based on the alleged Village Court agreement, the judgment in favor of Arrowhead on its abuse of process counterclaim, and any award of attorney fees against Moore are reversed, and the cause is remanded to the trial court with directions to dismiss Arrowhead's abuse of process counterclaim, with prejudice, and to conduct such further proceedings with respect to Moore's claim under the alleged Village Court contract as are consistent with the views set forth in this opinion.

DAVIDSON and TAUBMAN, JJ., concur.