**FILED**
**U.S. Bankruptcy Appellate Panel**
**of the Tenth Circuit**

**November 6, 2015**

**Blaine F. Bates**
**Clerk**

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE TENTH CIRCUIT

| | |
|---|---|
| IN RE MATTHEW EDWARD AUTTERSON, <br><br> Debtor. | BAP No.CO-14-063 <br> BAP No.CO-14-064 |
| GL3B TRUST II and GL3B PARTNERS LIMITED LLP, <br><br> Appellants, <br><br> v. <br><br> FIRST CITIZENS BANK & TRUST COMPANY and MATTHEW EDWARD AUTTERSON, <br><br> Appellees. | Bankr. No.13-30184 <br> Chapter 11 <br><br><br> OPINION[*] |

Appeal from the United States Bankruptcy Court
for the District of Colorado

Before **CORNISH**, **NUGENT**, and **SOMERS**, Bankruptcy Judges.

**SOMERS**, Bankruptcy Judge.

This case involves an objection by creditor and appellee, First Citizens Bank & Trust Co. ("Bank"), to certain debts that the debtor, Matthew Edward Autterson ("Autterson"), scheduled as uncontested claims of appellants GL3B Trust II (the "Trust") and GL3B Partners Limited, LLP (the "Partnership"). Autterson created and controlled both the Trust and the Partnership at all relevant times, and

---

[*]     This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion.  10th Cir. BAP L.R. 8018-6.

Autterson joined in the defense of the claims. The Bank objected that the claims had been scheduled and would be allowed for more than Autterson actually owed, to the prejudice of the other unsecured creditors. Following a two-day trial, the bankruptcy court granted the Bank's objection, in part, allowing but reducing the amount of the Trust and Partnership claims by approximately 26%.

## I.    BACKGROUND

In 2001, Autterson was a sophisticated and successful businessman who had just sold a trust company for a substantial profit.  He hired a number of advisors to help him manage his accumulated assets in such a way as to minimize the impact of income and estate taxes on them.  As a result of his tax and estate planning, Autterson created various legal entities, including both the Partnership and the Trust.  The Partnership was created in October 2001 as a Colorado limited liability partnership.[1]  Autterson has always acted as the Partnership's general and managing partner, though the partnership agreement was amended in 2013 to make the Trust an additional general partner.[2]  The Partnership's limited partners as of the petition date were GL3B Trust I and GL3B GRAT, both of which are also controlled by Autterson.[3]

As noted by the bankruptcy court, each of the Autterson entities maintained separate legal identities since their inception and have satisfied the standards for treatment as such.  Moreover, Autterson's dealings with these entities have always been carefully and appropriately documented, and money transfers from the Partnership and Trust to Autterson have always been treated as loans.  Based on

---

[1]    *Agreement of Limited Partnership of GL3B Partners Limited LLP in* Appellants' GL3B Trust II and GL3B Partners Limited LLP Appendix for Appellants' Opening Brief ("Appx") at 104-44.

[2]    *Id.* at 142.

[3]    Autterson's brother, Mark Autterson, is the designated trustee of Autterson's two trust entities, GL3B Trust I and GL3B Trust II (the appellants in this case).  However, there was no dispute at trial that the trust entities were "controlled" by Autterson.

this course of dealing, the bankruptcy court concluded, as do we, that the Partnership and Trust loans to Autterson are legitimate unsecured debts, entitled to be treated as such in Autterson's bankruptcy case. But what Autterson owed on these obligations as a matter of non-bankruptcy law is another matter.[4] The Trust and the Partnerships attempted to "gross up" their claims by strictly enforcing note terms that the debtor (who controlled the entities) routinely disregarded. The terms of the agreements cannot be enforced or disregarded by the "parties" according to their convenience, especially when doing so places the debtor's other unsecured creditors at a disadvantage.

### A. The Trust Note

In 2003, Autterson borrowed $2 million from the Partnership. The promissory note given to the Partnership by Autterson in return for the loan provided for repayment in fifteen equal payments of approximately $206,000, beginning in 2004 and continuing through 2018, annually. The note provided for interest on the principal in the amount of 6.00%, compounded annually, and a default rate of 12.00%, to be imposed on the date of a default.[5] In 2006, the Partnership divided up this debt and distributed it to its partners, pro rata, based on each partner's percentage interest in the Partnership.

The amount of the debt at the time of division was $2,336,595, including accrued but unpaid non-default interest.[6] Despite the loan's default status at that time, the divided sum did not include any default interest. The partners' shares were: (1) $530,314 to Autterson (22.7%); (2) $894,121 to GL3B GRAT (38.3%);

---

[4] *See* 11 U.S.C. § 502(b).

[5] *Promissory Note, dated May 19, 2003*, *in* Appx at 67-68.

[6] *Agreement Respecting Distribution of Promissory Note* ("Distribution Agreement") *in* Appx at 70-71. By the time the Distribution Agreement was executed, in January 2006, Autterson should have made the May 2004 and May 2005 payments. His failure to do so was an "Event of Default" under the terms of the underlying note, the occurrence of which triggered imposition of the default interest rate.

(3) $254,806 to GL3B Trust I (10.9%); and (4) $657,354 to the Trust (28.1%). The amount designated to go to Autterson was immediately cancelled.[7] Also, the amount designated to the GL3B Trust I was used to offset an even larger amount owed by that entity to Autterson.[8] Thus, only the GL3B GRAT and Trust portions remained post-division.

Autterson signed a note for the Trust's portion of the debt (the "2006 Note" or the "Trust Note"), which is one of the three claims at issue in this appeal. The 2006 Note carried a non-default interest rate of 4.48%, which accrued annually, and a 12% default interest rate. The note terms specified that all principal and interest became due and payable in full on January 15, 2015.[9] Prepayments of principal could be made at any time, without penalty, and any prepayments would be applied first to accrued interest and then to principal. Autterson made a total of fourteen payments attributed to the 2006 Note, beginning approximately four months after its issuance, and ending in December 2013.[10] For each year from 2006 to 2010, these twice-yearly prepayments totaled $9,380.[11] In 2011 through 2013, Autterson made annual payments in the amount of $4,460 each.

In his bankruptcy schedules, Autterson listed the 2006 Note as an uncontested debt in the amount of $933,393. At trial, the Trust claimed $857,648.60 was due on the 2006 Note as of the date Autterson filed his petition. However, the bankruptcy court concluded that, as the Trust had failed to prove

---

[7]     *Id.* at 70.

[8]     *Id.*

[9]     *Promissory Note, dated January 16, 2006*, *in* Appx at 65-66.

[10]    *See Trial Ex.*, 5 *in* Appx at 101-03. Because no payments were required by the terms of the 2006 Note until 2015, that note was the only one of the three notes at issue in this appeal that was not in default when Autterson filed his petition.

[11]    Autterson testified he made these payments to the Trust so that it could use the funds to make premium payments that were due for insurance on his life. *Oct. 27, 2014 Trial Transcript ("Trans. 1")*, 44-45 *in* Appx at 1040-41.

-4-

entitlement to any interest on the 2006 Note principal, its claim was allowed for principal only, in the amount of $597,074.

## B. The Partnership Notes

### 1. The 2008 Note

The Partnership held two promissory notes from Autterson when he filed his petition. The first was executed in 2008 (the "2008 Note") and was in exchange for Autterson's purchase of a residence owned by the Partnership. The home, located on Radcliffe Avenue, in Cherry Hills Village, Colorado (the "Residence"), was purchased by the Partnership in June 2005 for $1,875,000.[12] Autterson moved into the Residence within a few months of the Partnership's 2005 purchase of it, and lived there rent and mortgage free until he purchased it from the Partnership in 2008.[13] According to Autterson, he purchased the Residence in 2008, based on his counsel's recommendation that he either pay rent or purchase the property so that his use of it would be considered a bona fide "arm's length" transaction between related parties.[14] Autterson was required by a divorce settlement to pay his ex-wife's mortgage on her home, and decided to pay off that mortgage rather than making payments on it. In order to obtain the $1.25 million loan needed to do so, Autterson would have to provide that lender with collateral, which meant he needed to take ownership of the Residence.[15]

---

[12] *Special Warranty Deed in* Appx at 147. Autterson testified the Partnership also spent approximately $350,000 on improvements to the Residence between its purchase in 2005 and its sale to Autterson in 2008. *Trans. 1*, 54-55 *in* Appx at 1050-51.

[13] *Trans. 1*, 118-19 *in* Appx at 1114-15.

[14] *Id.* at 1126.

[15] *Id.* at 1126-28. As the Partnership did not secure the 2008 Note with a mortgage on the Residence, Autterson had its entire value available to use as collateral for other loans.

The face, or principal, amount of the 2008 Note was $2,219,359.19, and it carried a 2.87% non-default interest rate, and a 12% default rate.[16] Interest was to accrue and be paid annually on the first eight anniversaries of its execution, and principal was to be repaid in full on the day before the ninth anniversary.[17] Autterson paid the accrued interest, in the amount of $63,695.61, on the first anniversary of the 2008 Note, which was in April 2009.[18] However, he paid only approximately 25% of the accrued interest in 2010, the second anniversary of the 2008 Note, and made no payments on it after that.[19]

In his bankruptcy schedules, Autterson listed the 2008 Note as an uncontested debt. At trial, the Partnership claimed $3,449,340 was due on the 2008 Note as of the date Autterson filed his petition.[18] However, the bankruptcy court concluded that the Partnership had failed to prove entitlement to default interest under the 2008 Note and allowed the Partnership's claim, including principal and non-default interest, in the amount of $2,517,299.68.

## 2. The 2010 Note

The second note from Autterson to the Partnership was executed in April 2010 (the "2010 Note" and, together with the 2008 Note, the "Partnership Notes"). The 2010 Note had a face value of $500,000, and was given in exchange for a number of advances made to Autterson by the Partnership, both before and after the note was executed.[19] The 2010 Note carried a 2.7% non-default interest rate, a 12% default rate, and included the same nine anniversary payment terms as the

---

[16]     *Promissory Note, dated April 1, 2008, in* Appx. at 145-46.

[17]     *Id.*

[18]     *Trial Ex. 11 in* Appx at 152-53.

[19]     *Id.*

[18]     *Trans. 1*, 14 *in* Appx at 1010.

[19]     In fact, the advances already made by the Partnership to Autterson prior to his execution of the 2010 Note were well in excess of that Note's face value.

-6-

2008 Note.[20] Approximately three months after the 2010 Note was signed, Autterson paid the Partnership $466,123.19 on the 2010 Note, using proceeds from his sale of the Residence to third parties.[21] Previously, Autterson had purchased a new residence, located on Lafayette Street in Cherry Hills Village (the "Lafayette House"), which he listed on a September 30, 2010 personal financial statement as having a value of $3.7 million and a mortgage of more than $2.53 million.[22] The Partnership made a total of thirteen advances, from April 1, 2010 to December 6, 2013, to Autterson that were included in the principal balance of the 2010 Note.[23] The advances totaled $1,955,000.[24] The first of those advances, in the amount of $1,050,000 was for a down payment on the Lafayette House.[25] Approximately $400,000 of the advances were used by Autterson to modify an outstanding loan to various Communicom entities, for which Autterson was a guarantor.[26] The remaining proceeds were spent on capital improvements to the Lafayette House.[27]

Autterson filed his Chapter 11 bankruptcy petition on December 9, 2013. In his schedules, he listed $5,850,000 as an uncontested total amount due under the Partnership Notes. At trial, the Partnership claimed $1,907,193.33 was owed on

---

[20]     *Promissory Note, dated April 1, 2010, in* Appx at 154-55.

[21]     *Trial Ex. 14, Statement of Settlement, "Sellers" in* Appx at 157.

[22]     *Autterson Financial Statement, September 30, 2010, in* Appx at 981-82.

[23]     *Summary of Advances Under April 1, 2010 Note in* Appx at 156.

[24]     *Id.* (this amount was reduced to $1,488,876.81 by Autterson's single payment of $446,123.19).

[25]     *Trans. 1*, 88-89 *in* Appx at 1084-85. This advance was taken by Autterson on the very same day that he only partially made the required accrued interest payment on the 2008 Note, by which he had purchased his former home.

[26]     *Id.* at 1085. *See also*, *Guaranty Agreement (Autterson) in* Appx at 987-93.

[27]     *Trans. 1*, 89 *in* Appx at 1085.

the 2010 Note, for a lesser total of $5,356,533.33 for both Partnership Notes.[28]  The bankruptcy court determined that the 2010 Note was effectively "an open account advance line of credit where [the Partnership] failed to prove that it is owed interest."[29]  The bankruptcy court allowed the Partnership's claim on the 2010 Note in the amount of $1,488,876.81, consisting of all advances, less Autterson's one payment.

## II.    APPELLATE JURISDICTION

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[30]  The bankruptcy court's orders on appellants' claims, as well as its judgment on those orders, were entered on November 18, 2014, and an order establishing the amount of a claim against the bankruptcy estate is final for purposes of appeal.[31]  Appellants timely filed their notices of appeal on December 1, 2014, and no party elected to have the appeal heard by the district court.[32]  Therefore, this Court has valid appellate jurisdiction.

## III.    ISSUE AND STANDARD OF REVIEW

Whether the bankruptcy court erred by denying recovery of interest specified in the Trust and Partnership Notes.

---

[28]    *Trans. 1*, 15 *in* Appx at 1011.

[29]    *Transcript of Bankruptcy Court Ruling ("Ruling Trans.")*, November 14, 2014, 23-24 *in* Appx at 1347-48.

[30]    28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8002; 10th Cir. BAP L.R. 8001-3.

[31]    *In re Miller*, 284 B.R. 734, 736 (10th Cir. BAP 2002) (order disposing of objection to claim is a final order for purposes of appeal).

[32]    Pursuant to Fed. R. Bankr. P. 8002(a), a party seeking to appeal an order must file a notice of appeal from that order within fourteen days of its entry on the docket.

Our discussion of this issue involves the applicability of the concepts of waiver and parol evidence. These concepts require that both factual and legal issues be considered. A conclusion regarding applicability of the parol evidence rule is primarily a legal issue that is reviewed on appeal de novo.[33] However, waiver is primarily a factual issue that is reviewed for clear error.[34]

## IV. DISCUSSION

### A. Bankruptcy Court Ruling

Although the bankruptcy court did an excellent job of pulling the evidence presented at trial into an understandable narrative, it did not express a specific legal rationale for its legal conclusions. Nonetheless, this Court believes that the basis for the bankruptcy court's ruling may be gleaned from its oral findings and, even if not, an appellate court may affirm a trial court's decision on any basis that is supported by the record.[35] The bankruptcy court's ruling repeatedly emphasized the parties' "course of conduct." The conduct the court described, which was all subsequent to execution of each Note, established that the parties repeatedly ignored the express terms of the Notes over the course of several years. Such conduct may be determined to be a waiver of those terms, whether or not the bankruptcy court used that specific term. Thus, this Court interprets the bankruptcy court's fact findings to establish that the parties' course of conduct with respect to each Note indicated that strict compliance with the Notes' provisions would not be enforced. Specifically, the Partnership waived its right to charge default interest on the 2008 and 2010 Notes, and failed to prove its claim for non-default interest under the 2010 Note. The Trust, which was not entitled to

---

[33]     *Soc'y of Lloyd's v. Bennett*, 182 F. App'x 840, 845 (10th Cir. 2006).

[34]     *Healy v. Cox Commc'ns, Inc. (In re Cox Enters., Inc.)*, 790 F.3d 1112, 1115-16 (10th Cir. 2015) (conclusion of waiver is reviewed de novo, but facts underlying that conclusion are reviewed for clear error).

[35]     *See Eller v. Trans Union, LLC*, 739 F.3d 467, 476 (10th Cir. 2013) (appellate court may affirm on any ground adequately supported by the record).

default interest on the 2006 Note since payment on that Note was not due until after Autterson filed his bankruptcy petition, similarly failed to prove its claim for non-default interest.

### B. Waiver

It is well established that contract rights may be waived.[36] In Colorado, the elements necessary to effect a waiver of contract terms are:

> In general, a party may waive a contract provision where the party is entitled to assert a particular right, knows the right exists, but intentionally abandons that right. Waiver may be express or implied, such as when a party engages in conduct which manifests an intent to relinquish the right or privilege, or acts inconsistently with its assertion.[37]

Moreover, the Colorado Court of Appeals has held that a written contract may be modified by oral agreement, even if the contract expressly forbids such modifications.[38] That court also held that:

> [A]n express provision in a written agreement may be waived, either expressly or by implication. Such a waiver may be implied if a party engages in conduct which manifests an intent to relinquish the right or privilege or acts inconsistently with its assertion. And, the question of waiver is a question of fact . . . .[39]

Conduct that implies a waiver must be clear and unambiguous in order to be effective:

> Waiver is the intentional relinquishment of a known right or privilege. A waiver may be explicit, as when a party orally or in writing abandons an existing right or privilege; or it may be implied, as, for example, when a party engages in conduct which manifests an intent to relinquish the right or privilege, or acts inconsistently with its assertion. Although an intent to waive a benefit may be implied by

---

[36] *In re Cox Enters., Inc.*, 790 F.3d at 1115.

[37] *Tarco, Inc. v. Conifer Metro. Dist.*, 316 P.3d 82, 89 (Colo. App. 2013) (internal citations and quotation marks omitted).

[38] *James H. Moore & Assoc. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994).

[39] *Id.* (citations omitted).

conduct, the conduct itself should be free from ambiguity and clearly manifest the intention not to assert the benefit.[40]

These concepts apply to the present facts. As Autterson is both the borrower and his lenders' representative, no communication whatsoever between the "parties" was the norm. Autterson, when acting on behalf of the Partnership or the Trust, did not issue default notifications to himself, nor did he directly express an intent to waive the Notes' provisions. Instead, after signing standard agreements on behalf of both parties, he simply paid or did not pay his obligations as he saw fit. In fact, Autterson claimed not even to realize that the Partnership Notes were in default until he was preparing to file his personal bankruptcy.[41] Nonetheless, his conduct on both sides of the transactions can hardly be interpreted in any other way than as a waiver of the express terms of the written agreements. Autterson paid interest only if, and when, it suited his interests.

The bankruptcy court emphasized the inter-relatedness of Autterson and the Partnership and Trust in its ruling, stating:

> While the trust and partnership have maintained their separate formal legal identities for many years they have both been fully controlled by Mr. Autterson. They have both engaged in transactions with him, involving substantial dollars in property which could not be characterized as arms' length. Several transactions involve Mr. Autterson calling the tune on both sides of the table, having little resemblance to transactions where each side of the deal is looking out for its own interests. . . . The partnership advanced funds to Mr. Autterson with little regard to his capacity or intent to repay the funds.[42]

This unity of interest between the parties is precisely why the Bank objected to the Partnership and Trust claims, arguing the advances to Autterson were equity payments due to lack of any creditor/debtor relationship. Although the bankruptcy

---

[40]     *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984) (internal citations omitted).

[41]     *See, e.g., Trans. 1*, 65 *in* Appx at 1061.

[42]     *Ruling Trans.*, 7-8 *in* Appx at 1331-32.

-11-

court at least partially agreed with this sentiment, it nonetheless refused to invalidate any of the principal of the Notes, stating:

> The evidence of the parties' course of dealings carries the day. The Court concludes that the trust and the partnership claims are in fact debts of this Debtor. They have never been treated otherwise. The non-arm's length dealings of affiliates does not itself mean that the debt should be treated as equity where the formalities of a debtor/creditor relationship have been honored.[43]

This conclusion, from which the Bank did not appeal, resulted in an award in excess of $9 million to the Partnership and Trust. Had the bankruptcy court concluded that the unity of interest between the parties rendered their agreements illusory and unenforceable, there would have been no award of principal at all. Instead, the bankruptcy court determined the Notes' interest terms were ambiguous and, therefore, subject to interpretation in light of the parties' conduct. The Colorado Court of Appeals has affirmed a trial court's refusal to award pre-judgment interest on the amount due under a promissory note, using the doctrine of waiver, stating:

> Waiver of a contract term occurs when a party to the contract is entitled to assert a particular right, knows the right exists, but intentionally abandons that right.
>
> Here, although the promissory note called for interest at the rate of ten percent per annum, [creditor's] internal records showed that all of the [borrower's] payments were credited to principal. And, all of the statements [creditor] sent indicated that only a principal balance was due. Moreover, when the deed of trust was executed, the amount due reflected that all credits for payments made had been applied to principal, and no claim for interest was then made. In our view, evidence of these actions supports the trial court's finding that [creditor] waived its right to collect the prejudgment interest to which it otherwise would have been entitled.[44]

---

[43] *Id.* at 1336.

[44] *Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1019 (Colo. App. 1989) (citation omitted). Significantly, there was no transfer of consideration between the unrelated parties in *Ebrahimi* in exchange for this waiver, nor any contention that such was required.

The factual findings the bankruptcy court made regarding intent to waive interest are supported by the record on appeal.[45]  Some of the evidence the court relied on included: (1) the 2006 Note represents the Trust's pro rata share of a previous debt owed by Autterson to the Partnership, including only regular accrued interest, even though the previous loan was in default at the time and therefore subject to default rate interest; (2) Autterson prepared several financial statements for the Bank and others that suggest he considered the amounts due under the Partnership and Trust Notes did not include interest;[46] (3) Michael Winterscheidt, the accountant for Autterson, the Trust, and the Partnership, did not calculate the amounts due under the Notes until Autterson was preparing to file bankruptcy; (4) Mr. Winterscheidt inflated the amounts Autterson owed by prematurely triggering interest accrual whenever a payment was made so that the payment would be applied to interest rather than principal, which violated the Notes' provisions that principal could be prepaid without penalty and that interest only accrued annually; (5) default interest had not been charged on the Partnership Notes despite their having been in default for years; (6) although the 2006 Note did not require payment until 2015, advances Autterson made to fund the Trust's annual life insurance premiums were credited to that Note, but only in preparation for Autterson's bankruptcy filings; (7) the face value of the 2010 Note bore no relationship to the amounts advanced to Autterson up to its execution; and (8) in

---

[45]     An appellate court must review trial findings in a light most favorable to the prevailing party and, when trial was to the court rather than a jury, those findings are "presumptively correct." *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 510-11 (10th Cir. 1985).

[46]     Appellants argued at trial that Autterson's personal financial statements should not bind the Trust or Partnership.  In the view of the bankruptcy court, that argument was "too cute."  We agree.  Where an individual completely controls a business entity, particularly ones he established and funded, the line between individual and business identities is blurred.  Autterson acted at all times in a manner he deemed beneficial to himself and his related entities.  We see no reason to differentiate between his personal and his business conduct when even he did not do so.

general, the parties did not act as if the terms of the notes controlled their dealings. From these and other facts, the court concluded that "the parties' course of dealing [regarding the 2010 Note was] so far removed from the [N]ote terms, that the [N]ote itself reveals little or nothing about what is owed."[47]

The bankruptcy court found only with respect to the Partnership's 2008 Note related to sale of the Residence did the parties' course of dealing "bear[] any resemblance to the terms of the note." However, as no default interest was charged on that loan despite Autterson's repeated failures to make the required payments, the court determined that the balance due on that note did not include default rate interest. Thus, the allowable amount of the claim based on the 2010 Note was calculated by simply subtracting applied payments from the relevant advances. Finally, the bankruptcy court denied all interest on the 2006 Note, finding both that "not a single interest payment was made in accordance with the note's terms in over six years," and that the trustee, Autterson's brother, didn't even know how to treat the payments that were made.[48] Thus, the claim based on the 2006 Note was also allowed in the amount of principal minus credits for insurance premium payments made by Autterson.

In its brief on appeal, Bank asserts, apparently for the first time, that the parties "modified" the Notes' interest provisions through their conduct. Appellants assert that the Bank's failure to rely on the legal concept of contract modification in the bankruptcy court, together with the bankruptcy court's failure to expressly base its decision on that ground, should preclude this Court's consideration of that issue as well. However, since an appellate court may affirm on an entirely different basis than the one relied on by the bankruptcy court, the principle that an argument not made in the trial court may not be made on appeal typically applies

---

[47]    *Ruling Trans.*, 23 *in* Appx at 1347.

[48]    *Id*. at 1348.

only to appellants.[49]   Thus, appellate courts are not at liberty to *reverse* on grounds not presented to the trial court, with the exception of lack of subject matter jurisdiction.[50]  In any event, this Court's decision is based on waiver rather than modification.

Besides arguing that the modification issue should not be considered on appeal, appellants attack applicability of modification to the facts on several grounds.  First, they deny that any of the conduct in which they engaged can be considered "clear and unambiguous" evidence of intent to waive interest.[51]  This denial is self-serving and of little weight.  The bankruptcy court considered many facts to support an inference that interest, particularly default interest, would not be charged.  The fact that Autterson claims he "didn't know" he was in default on the Notes until preparing his filings for bankruptcy is fairly compelling evidence that no one was treating the express terms of the Notes as binding.  Autterson's testimony to the effect that he always intended to repay the Notes, and that neither the Trust nor the Partnership ever waived interest, does not outweigh the fact that interest was never charged.[52]

Appellants also assert that a contract modification requires additional consideration, and none was forthcoming from Autterson that would support the waiver of interest by the Note holders.  Thus, the concepts of contract waiver, modification, and estoppel with respect to agreements are related and somewhat intertwined, and may sometimes, but not always, be used interchangeably.  Relying

---

[49]    *See In re Nestlen*, 441 B.R. 135, 141 (10th Cir. BAP 2010) (quoting *Griess v. Colorado*, 841 F.2d 1042, 1047 (10th Cir. 1988)).

[50]    *See Rademacher v. Ass'n of Soil Conservation Dist. Med. Benefit Plan*, 11 F.3d 1567, 1571 (10th Cir. 1993) (appellate court may consider matters not raised below in unusual circumstances, such as issues regarding jurisdiction).

[51]    Appellant's Reply Br. at 6.

[52]    *Trans. 1*, *2006 Note*, 48, *2008 Note*, 71, *2010 Note*, 92 *in* Appx at 1044, 1066, 1088.

on *Corbin on Contracts*, the New Mexico Supreme Court clarified the distinctions between the concepts, stating:

> The law of waiver as discussed by Professor Corbin and our own cases suggests several possible situations: (1) actual waiver, either express or implied in fact, not supported by consideration, which may be retracted in the absence of detrimental reliance; (2) modification, which is not subject to retraction, based upon mutual agreement to waive certain obligations or conditions and the exchange of consideration; or (3) waiver by estoppel based upon either an actual waiver or certain "expressions or conduct" where the reliance of the opposite party and his change of position justifies the inhibition to assert the obligation or condition.[53]

What the record before this Court demonstrates is waiver by the Partnership and the Trust of their respective rights to hold Autterson in default and to charge him interest on his loans. According to Professor Corbin, waiver of a contractual right requires no additional consideration. In Colorado, waiver of a default "may be shown by accepting payment after default, by accepting payment after giving notice of an election to accelerate, *or by mere inaction*."[54]

> In this case, each of the Notes included the following terms:
>
> Default. An event of default ("Event of Default") shall occur if Borrower fails to make any principal or interest payment when due. Upon the occurrence of an Event of Default, interest shall be payable at a rate of 12% per annum from the date of the Event of Default. . . .
>
> Miscellaneous. (a) Presentment, notice of dishonor, and protest are hereby waived by Borrower . . . .[55]

Although the Notes neither required the Partnership or the Trust to declare a default nor to exercise an option to apply default interest, that does not rule out waiver of the default interest provision. Nor does lack of additional consideration preclude waiver.

---

[53] *J.R. Hale Contracting Co. v. United New Mexico Bank*, 799 P.2d 581, 586 (N.M. 1990).

[54] *Goodwin v. Dist. Court*, 779 P.2d 837, 843-44 (Colo. 1989)(en banc)(emphasis added).

[55] *2006 Note, 2008 Note, & 2010 Note in* Appx at 65, 145, 154.

None of the Notes in this case were ever declared to be in default, nor was Autterson ever directed to make missed payments. The terms of each of the Notes were ignored until Autterson was preparing his bankruptcy filings. For example, the 2006 Note did not require scheduled payments, but payment in full was required on or before January 15, 2015. In preparation for bankruptcy, Autterson asked his accountant (who was also the accountant for both the Trust and the Partnership) to determine what was owed on each Note. The accountant applied all of Autterson's life insurance payments to the 2006 Note, even though no payments were due on that Note. In fact, the accountant applied insurance premium payments made after April 1, 2010 (when the 2008 Note was technically in default), as credits to the 2006 Note. Similarly, the 2010 Note was technically in default as of April 1, 2011, yet the Partnership continued to advance significant amounts of money on that Note until December 2013, shortly before Autterson filed his bankruptcy petition. This fact led the bankruptcy court to note that the Partnership had "advanced funds to Mr. Autterson with little regard to his capacity or intent to repay the funds."[56] We agree.

Each of these transactions was effectuated on behalf of both parties by Autterson, and only documented by the Notes themselves. Few actual payments were made in accordance with the terms of the Notes, and what were construed to be payments were not actually "applied" to a particular Note until it suited Autterson's needs to do so. Autterson was always aware of the implications of his transactions, as well as the effect of his impending bankruptcy on both himself and his wholly-controlled entities. Only when preparing his bankruptcy filings, he asserts, did he even realize the 2008 and 2010 Notes were in default, yet he assured the bankruptcy court on behalf of the Partnership and the Trust that "they" never waived his defaults or had any intention of not charging him interest. This is

[56]     *Ruling Trans.*, 8 *in* Appx at 1332.

patently without merit.  Being on all sides of these transactions, Autterson must be charged with knowledge of the terms of the Notes, that he had made or missed payments, and of the events and effects of default on *both* obligor and obligee.  He chose not to make required payments and to forego the enforcement of penalties.  Indeed, he chose to keep advancing Partnership funds to himself with full knowledge that the Note under which the advances accrued was already in default.  He cannot now avoid the consequences of his conduct by simply asserting that he didn't know.  His conduct, on his own behalf and on behalf of his entities, plainly and definitively indicates that there was no intention to enforce the default provisions of the Notes.  In addition, Autterson's decision to ignore the terms of the 2006 and 2010 Notes for years made it impossible for the Trust and the Partnership to prove a case for interest at all.  There was no contemporaneous application of credits, no payments that corresponded to the terms of the Notes, and clearly no intent to do more than simply repay the principal on those Notes.  Autterson did not even calculate or indicate the interest that was owed on the Notes for his personal financial statements.  We therefore conclude that the appellate record supports the bankruptcy court's decision to disallow the interest portion of the obligees' claims.

### C.    Parol Evidence Rule

Appellants assert that the bankruptcy court violated the parol evidence rule by finding the Notes' terms to be ambiguous, and then considering the parties' conduct in order to determine their intent with respect the contract terms.  The parol evidence rule provides that extrinsic (or "parol") evidence may not be used to interpret the intent of a written agreement unless the agreement is "ambiguous."[57]

---

[57]    *See, e.g., Gagne v. Gagne*, 338 P.3d 1152, 1163 (Colo. App. 2014) (extraneous evidence may only be admitted to prove intent when there are ambiguous contract terms); *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1238 (10th Cir. 2014) (courts may only consider extrinsic

(continued...)

Thus, clear and unambiguous contract terms may not be altered by evidence that suggests a different intent. The rule, however, only excludes evidence of "*prior or contemporaneous* oral agreements," and therefore, does not alter the long-standing rule that parties may waive or alter the terms of their agreements by their conduct after the agreement is in place.[58] Thus, the parol evidence rule does not apply to evidence that establishes "a modification or termination of even an integrated agreement."[59]

Although the bankruptcy court did determine the Partnership and Trust Note terms to be ambiguous, it did so only in disagreement with testimony by appellants' accountant to the effect that he had calculated the amounts due on each Note as "prescribed by the clear and unambiguous terms" of the Notes.[60] The court simply disagreed. It did not rule that the parol evidence rule was inapplicable, nor did it consider prior or contemporaneous evidence to determine the parties' intent when the Notes were executed. Rather, it considered conduct subsequent to execution of the Notes in reaching the conclusion that, whatever the parties' initial intent had been, strict compliance with the Notes' terms would not be enforced. Where the parties' subsequent conduct indicated that default was not an issue and

---

[57]     (...continued)
evidence to determine intent when written documents are ambiguous) (applying Colorado law).

[58]     11 Williston on Contracts § 33:1 (4th ed.) (emphasis added) ("The parol evidence rule is a substantive rule of law that prohibits the admission of evidence of prior or contemporaneous oral agreements, or prior written agreements, whose effect is to add to, vary, modify, or contradict the terms of a writing which the parties intend to be a final, complete, and exclusive statement of their agreement.").

[59]     11 Williston on Contracts § 33:14 (4th ed.); *see also*, *Exchange Nat'l Bank v. Sparkman*, 554 P.2d 1090, 1093 (Colo. 1976) (parol evidence rule does not preclude modification of a contract by conduct); *S. Colo. MRI, Ltd. v. Med-Alliance, Inc.*, 166 F.3d 1094, 1099 (10th Cir. 1999) (contract may be modified or waived in whole or part by the parties' subsequent words and actions).

[60]     *Ruling Trans.*, 19 *in* Appx at 1343.

default interest would not be applied, that conduct indicated an intent to waive provisions of the Notes to which they had previously agreed. In addition, their conduct indicated that application of any interest under any Note would be decided on a case-by-case (or note-by-note) basis. As this decision has already discussed, the bankruptcy court's findings with respect to intent are supported by the evidence and, are therefore, not clearly erroneous. Moreover, consideration of conduct subsequent to execution of an agreement to determine intent at that time does not violate the parol evidence rule.[58]

## V. CONCLUSION

The record supports a finding that the interest provisions of the Trust and Partnership Notes were intentionally waived by the parties' conduct subsequent to execution of the Notes. Therefore, the bankruptcy court's reduction of interest allowed under the Notes is AFFIRMED.

---

[58] *See Ziegler v. Hendrickson*, 528 P.2d 400, 403 (Colo. App. 1974) (parol evidence rule does not exclude conversations after execution of agreement that show waiver the terms); *In re Cont'l Res. Corp.*, 799 F.2d 622, 626 (10th Cir. 1986) (An "exception to the parol evidence rule is when there has been a subsequent alteration or modification of the terms of a contract.").